#28771-a-MES
**2020 S.D. 54**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

TREVOR ZEPHIER,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
CHARLES MIX COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BRUCE V. ANDERSON
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

ANN C. MEYER
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff and
    appellee.

BRADLEY D. KERNER
Armour, South Dakota

KEITH GOEHRING
Parkston, South Dakota                    Attorneys for defendant and
    appellant.

* * * *

CONSIDERED ON BRIEFS
NOVEMBER 4, 2019
OPINION FILED **09/23/20**

SALTER, Justice

[¶1.]     Trevor Zephier appeals his convictions for first-degree burglary and grand theft, arguing the circuit court erred when it denied his motion to suppress evidence that was returned to the owner before trial. Zephier also alleges the court abused its discretion when it denied his motion for expert fingerprint testing. We affirm.

## Background

[¶2.]     At approximately 7:00 a.m. on December 9, 2016, Yankton Sioux Tribal Police received a call of shots fired at Shawn Patterson's residence in rural Lake Andes. Lieutenant Willard Bruguier, Jr., responded to the call and learned from Patterson that two shots were fired from a dark-colored vehicle in his driveway. The vehicle drove off after the shooting.

[¶3.]     Lieutenant Bruguier patrolled the area and saw a maroon two-door car matching Patterson's description. He approached the vehicle, and Zephier got out of the car through the driver's door to speak with Bruguier who advised that he was investigating a report of shots fired. Zephier responded by stating there were no guns in his car. Lieutenant Bruguier did notice that there were other occupants in Zephier's vehicle—a female in the passenger seat and a man later identified as Daniel Cranmer was in the back seat. Bruguier noticed that Cranmer appeared nervous and "fidgety."

[¶4.]     Zephier was subject to Yankton Sioux Tribal Court supervision conditions that authorized random warrantless searches and seizures, and Lieutenant Bruguier elected to detain him. As Bruguier was administering a

preliminary breathalyzer test (PBT) to Zephier, Cranmer moved to the driver's seat and drove off. Another tribal officer arrived in time to lend pursuit, and a high-speed chase ensued. Cranmer soon lost control of Zephier's vehicle, which left the road and rolled before coming to rest on its roof in a ditch.

[¶5.] Cranmer fled the scene and was later apprehended at Patterson's residence. Tribal officers looked inside the vehicle and saw several guns in the back seat. Since the accident occurred on land subject to state—not tribal—jurisdiction, they contacted the Charles Mix County Sheriff's Office.[1] Chief Deputy Derik Rolston and another deputy arrived at the scene. They recovered nine guns from the back seat of Zephier's car and an additional seven guns from the trunk. Chief Deputy Rolston photographed the guns and transported them to the sheriff's office, where each gun was inspected and inventoried. Additional photographs of each gun's model and serial number were taken at the sheriff's office.

[¶6.] Suspecting the guns could belong to Joe Soulek based on an unrelated 2010 reported gun theft, Chief Deputy Rolston contacted Soulek, who came to the

---

1. Much of Charles Mix County was originally included in the Yankton Sioux Indian Reservation that was established by treaty in 1858. *See Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 998 n.4 (8th Cir. 2010) ("Although the 1858 Treaty refers to 400,000 acres, a later survey concluded the reservation contained 430,405 acres at the time of the treaty."). As a consequence of an 1892 surplus land agreement between the Yankton Sioux Tribe and the United States, along with a policy of allotting land to individual tribal members, the area was opened to non-Indian settlement at the end of the nineteenth century. *Id.* at 999-1000. Today, criminal jurisdiction is exercised by federal, state, and tribal law enforcement agencies according to "a complex checkerboard pattern" under which trust land held by the United States for the benefit of the tribe or its individual members is subject to tribal and federal jurisdiction, while non-trust land held in fee is generally subject to state jurisdiction. *See id.* at 1002.

sheriff's office. Soulek identified the guns as his, but told the officers they were not the guns he previously reported stolen. In fact, Soulek was not aware the guns recovered from Zephier's car had been stolen since he had recently been away from home. The sheriff's office returned the guns to Soulek that day except for the gun suspected to have been fired at the Patterson home, which was turned over to tribal police. At trial, Chief Deputy Rolston testified that he called the state's attorney, who advised him that he could return the guns to Soulek.[2]

[¶7.] Not long after he was apprehended, Cranmer confessed to tribal officers that he and Zephier had stolen the guns from Soulek's house. Cranmer explained that he had previously worked for Soulek and knew he kept several guns in his house. According to Cranmer, he and Zephier drove to Soulek's house in Zephier's car, and Zephier entered the residence. While Cranmer acted as the lookout, he claimed Zephier removed several armfuls of guns from the house and loaded them into his car. Cranmer advised that their plan was to trade the guns for drugs and that Zephier had already traded two stolen pistols[3] for drugs and cash prior to being apprehended.

[¶8.] Zephier also gave a statement to tribal officers. In it, he explained that he had no knowledge that there were guns in his car when Lieutenant Bruguier detained him.

---

2. Soulek agreed to return the guns to the sheriff's office before Zephier's trial, and the sheriff's office inventoried the guns again once when they received them back from Soulek approximately two weeks before Zephier's trial.

3. Two commemorative .45 caliber pistols that Soulek reported as missing were not recovered.

[¶9.]     Based on Cranmer's statement, Chief Deputy Rolston obtained a warrant for Zephier's arrest, and the State charged him with first-degree burglary and grand theft.  *See* SDCL 22-32-1(3), SDCL 22-30A-1, and SDCL 22-30A-17 (classifying theft offenses).  Zephier made his initial appearance and posted bond.

[¶10.]     Zephier moved for suppression of the guns, asserting that the State would be unable to establish a proper chain of custody based on its decision to immediately return the guns to Soulek.[4]  *See* SDCL 23A-37-15 (requiring "law enforcement personnel in possession of . . . [seized] property" to notify the defendant before returning it to the owner and retain it if ordered by the court).  In the alternative, Zephier sought forensic testing of the guns to confirm what he claimed would be the absence of his fingerprints.

[¶11.]     While acknowledging concern about law enforcement's noncompliance with statutory standards for preserving evidence, the circuit court denied Zephier's motions.  Applying the materiality test from our decision in *State v. Lyerla*, 424 N.W.2d 908 (S.D. 1988), the court reasoned that "an objective officer would not have known at the time of returning the guns that they contained some exculpatory information."  The court recognized that the lack of fingerprint evidence had some potential exculpatory value, but it would not necessarily exonerate Zephier if, for instance, he had worn gloves when he handled the guns.

[¶12.]     The circuit court made the same determinations in its subsequent findings of fact and conclusions of law and further found that, at a minimum,

---

4.     Zephier also sought an order in limine to preclude the State from offering any evidence or testimony of the guns.

Zephier constructively possessed the guns when they were in his vehicle. The court reasoned that the circumstances "ma[de] it unforeseeable that the Defendant would later claim to have never seen or touched any of the firearms." In the court's view, Zephier had not established that "fingerprints or other biological material" or "the lack of his fingerprints on the guns amounts to [favorable] evidence . . . ." Lastly, the court concluded that there was no evidence the State acted with bad faith when it returned the guns to Soulek.

[¶13.]     As it related to Zephier's request to test the previously-returned firearms, the court denied relief, essentially concluding that it was "too late" for testing because the guns had been handled by deputies and then released to Soulek.[5] However, the court told the parties that Zephier's defense counsel would be given "great leeway" at trial to discuss the failure to preserve the evidence and its potentially exculpatory value.

[¶14.]     Zephier's case was tried to a jury on December 4 and 5, 2017. During trial, Zephier renewed his motion to suppress the guns upon learning, apparently for the first time, that Chief Deputy Rolston had received permission from the state's attorney to release the guns to Soulek. The circuit court again denied Zephier's request, finding that the state's attorney's involvement in the decision to return the guns did not change its previous analysis.

---

5.     Zephier's counsel agreed that the ability to analyze the guns for fingerprint evidence had likely been adversely impacted by the premature return to Soulek.

[¶15.]     The State called Cranmer as a witness.[6]  Consistent with his previous statement, Cranmer told the jury that he and Zephier had formulated a plan months before the burglary to steal guns from Soulek and trade them for drugs. Cranmer claimed that he never entered Soulek's home on the morning of the burglary, but instead stayed in the car while Zephier made several trips into Soulek's home to remove the guns, which Cranmer then helped load into the car. Soulek also testified, explaining that the stolen guns had an estimated value of $15,950.

[¶16.]     Zephier testified in his defense and told jurors that he had loaned his car to Cranmer in the early morning hours of December 9 in exchange for gas money, but Cranmer kept the car much longer than expected, picking Zephier up between 7:30 and 8:00 a.m.  Zephier told jurors that he had no knowledge the stolen guns were in his vehicle when he spoke with Lieutenant Bruguier later that morning and only became aware of the guns while in tribal custody following his arrest.  Zephier also explained that the back seats of his car fold down to allow access to the trunk, suggesting all the guns could have been kept in the trunk prior to the rollover accident.

[¶17.]     The circuit court gave the jury a specific instruction regarding law enforcement's failure to comply with statutory standards regarding evidence preservation.  The instruction stated that it was for the jury's "sole and exclusive determination whether returning the property to Joe Soulek . . . bears upon the

---

6.     Cranmer reached a plea agreement with the State to plead guilty to the grand theft charge in exchange for the dismissal of the first-degree burglary charge.

innocence or guilt of the defendant." Zephier did not object to this instruction.

Regarding law enforcement's failure to notify Zephier before returning the guns, the

prosecutor told the jury, "[W]hat you need to decide is okay, they didn't follow the

procedure. But does that make him innocent? No, he's still guilty. He did the

crime." For his part, Zephier's defense counsel argued that there was "a lot of

reasonable doubt" whether Zephier committed this crime.

[¶18.] The jury convicted Zephier of first-degree burglary and grand theft,

and the circuit court sentenced him to 25 years in the penitentiary with 15 years

suspended for the burglary conviction and 10 years in the penitentiary with 5 years

suspended for the grand theft conviction.[7] The court ordered Zephier's sentences to

run concurrent with credit for time served.

[¶19.] Zephier raises several issues on appeal, which we consolidate and

restate as follows:

> 1.  Whether the circuit court erred when it denied Zephier's motion to suppress the gun evidence.
>
> 2.  Whether the circuit court abused its discretion when it denied Zephier's motion for expert analysis of fingerprint evidence on the guns.

---

7.  Zephier's sentencing took place close to ten months after trial because he failed to appear for several sentencing dates.

## Analysis

### *Due Process and Preserving Evidence*

[¶20.]        The Due Process Clause of the Fourteenth Amendment imposes upon states the requirement to ensure that "criminal prosecutions . . . comport with prevailing notions of fundamental fairness."[8] *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413 (1984).  Implicit in this standard is the necessity that "criminal defendants be afforded a meaningful opportunity to present a complete defense."  *Id.*  The resulting body of decisional law from the United States Supreme Court and this Court exist under a topical heading that "might loosely be called the area of constitutionally guaranteed access to evidence."  *Id.* (quoting *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S. Ct. 3440, 3446, 73 L. Ed. 2d 1193 (1982)); *see also State v. Jackson,* 2020 S.D. 53, ¶ 26, ___ N.W.2d ___.

[¶21.]        Within the broad category of these decisions, two distinct lines of cases have developed—cases in which the exculpatory value of the undisclosed evidence is known and cases where it is not.  The former is illustrated by the prototypical violation of the rule set out in *Brady v. Maryland* where a prosecutor does not share information or evidence that is, nevertheless, identifiable and intact and is "either material to the guilt of the defendant or relevant to the punishment to be imposed." *Trombetta*, 467 U.S. at 485, 104 S. Ct. at 2532 (citing *Brady*, 373 U.S. 83, 87, 83 S.

---

8.    We review the circuit court's "denial of a motion to suppress based on [an] alleged violation of a constitutionally protected right . . . de novo." *State v. Willingham*, 2019 S.D. 55, ¶ 21, 933 N.W.2d 619, 625 (quoting *State v. Rolfe*, 2018 S.D. 86, ¶ 10, 921 N.W.2d 706, 709).

Ct. 1194, 1196, 10 L. Ed. 2d 215 (1963)); *see also United States v. Agurs*, 427 U.S. 97, 110, 96 S. Ct. 2392, 2401, 49 L. Ed. 2d 342 (1976) (holding that prosecutors must disclose exculpatory evidence that would raise a reasonable doubt about the defendant's guilt, even in the absence of a specific request). Whether the prosecution's suppression of this type of evidence will lead to a due process violation that results in a new trial turns on the materiality of the suppressed evidence—not the good faith or bad faith of the prosecutor. *See State v. Birdshead*, 2016 S.D. 87, ¶ 18, 888 N.W.2d 209, 215 (citation omitted) (holding *Brady* evidence "is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"); *Thompson v. Weber*, 2013 S.D. 87, 841 N.W.2d 3 (applying *Brady* to a child rape victim's undisclosed counseling records).

[¶22.]     However, materiality and good faith are viewed differently in the second type of access-to-evidence cases. Included in this grouping are cases where the exculpatory value of the undisclosed evidence is unknown because it has been destroyed, or lost, or compromised in some way. As a consequence, courts seeking to assess the materiality of the lost evidence face a practical complication:

> Whenever potentially exculpatory evidence is permanently lost, the courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed. Moreover, fashioning remedies for the illegal destruction of evidence can pose troubling choices. In nondisclosure cases, a court can grant the defendant a new trial at which the previously suppressed evidence may be introduced. But when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing the State's most probative evidence.

*Lyerla*, 424 N.W.2d at 910-11 (quoting *Trombetta*, 467 U.S. at 486-87, 104 S. Ct. at 2533).

[¶23.]     In *Trombetta*, the United States Supreme Court held that law enforcement officers did not violate a defendant's due process right to access evidence by failing to preserve breath samples in prosecutions for driving while under the influence.  467 U.S. at 491, 104 S. Ct. at 2535.  As part of its analysis, the Supreme Court created a test for determining the materiality of evidence that no longer exists:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.  To meet this standard of constitutional materiality . . . evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* at 488-89, 104 S. Ct. at 2534 (internal citation omitted).

[¶24.]     However, *Trombetta's* materiality test will not resolve all due process challenges in cases of lost or destroyed evidence.  *See Jackson*, 2020 S.D. 53, ¶¶ 28-30, ___ N.W.2d ___.  In some instances, this evidence cannot satisfy the materiality test, and the most that could be said is that it "could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281 (1988).  For these cases involving only "potentially useful" lost or destroyed evidence, the Supreme Court contrasted the rule of *Brady* that "makes the good or bad faith of the State irrelevant" and held that a defendant must show that law enforcement officers acted in bad faith to establish a due process violation:

> [R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

*Id.* at 58.

[¶25.] In South Dakota, our Legislature has enacted statutory standards governing law enforcement officers' obligation to preserve evidence. *See* SDCL 23A-37-14 and SDCL 23A-37-15. In this appeal, the parties' arguments suggest, and we agree, that these statutes simply reflect the requirements of due process. Zephier has not, in other words, argued that state law "impos[es] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337.

[¶26.] The provisions of SDCL 23A-37-14 state in relevant part that:

> [P]roperty . . . seized or confiscated by law enforcement personnel, ostensibly for use as evidence in a criminal prosecution shall be preserved, maintained, or stored at the expense of the county where the criminal offense occurred. If the property . . . is owned by a victim of the crime being investigated, the property shall be photographed by the appropriate law enforcement personnel and returned to the victim of the crime within thirty days of completion of forensic analysis unless the prosecuting attorney deems it essential to the prosecution of the case to retain the evidence. The photographs shall accurately and correctly represent the property and are admissible evidence . . . in any resulting criminal proceeding.

[¶27.] However, before releasing evidence to its owner, SDCL 23A-37-15 requires law enforcement officers to notify the defendant:

> Before any property is returned to the owner pursuant to § 23A-37-14, the law enforcement personnel in possession of the property shall notify the defendant that the property will be returned to the owner. Upon a motion made by the defendant and upon good cause shown that the property contains exculpatory evidence of the defendant's innocence, the court may order the law enforcement personnel in possession of the property not to release it to the owner.

[¶28.] Here, the State acknowledges law enforcement officers and the prosecutor did not comply with these statutory standards.[9] After officers sought guidance concerning the disposition of the recovered firearms, the local prosecutor incorrectly advised them to release the guns to Soulek without notice to Zephier. In this way, the State failed to preserve Zephier's right to examine the guns for the presence or absence of forensic evidence. Although the guns were not, themselves, destroyed or lost, the evidence Zephier sought—the absence of his fingerprints—was likely compromised to such an extent it was effectively lost. In fact, Zephier acknowledges on appeal that the decision to return the guns to Soulek "may have [caused] some changes in the fingerprints." The circuit court perceived the argument in the same way and found that Zephier's pretrial argument posited that

---

9. Throughout the record, the parties and the circuit court have described the State's noncompliance as a failure to obtain a court order allowing the return of the property. However, as it relates to statutory compliance, the State may return seized property no longer deemed essential to the prosecution of the case without a court order under the provisions of SDCL 23A-37-15, but it cannot do so without providing notice to the defendant, who may then move for an order preventing the State from returning the seized property. The source of the reference to a requirement for a court order may have been SDCL 23A-37-2, which prevents efforts to *take* seized evidence from its proper custodian without a court's order, or the process set forth in SDCL 23A-37-4 through 23A-37-8 pertaining to applications for return of property by those claiming a right to possession of such property. However, these statutory requirements do not apply to the situation here.

"exculpatory evidence was lost" by returning the firearms to Soulek. The court's other findings further detail the extent to which law enforcement officers necessarily handled the guns in their effort to inspect and photograph them. Under these unique circumstances, we will analyze the claim as one involving lost or destroyed evidence.

[¶29.] However, we have never held that a violation of SDCL 23A-37-15 leads reflexively to a due process violation and the sanction of exclusion or a new trial. *See, e.g.*, *Lyerla*, 424 N.W.2d at 911 (holding that a violation of SDCL 23A-37-15 "does not automatically vitiate the conviction"). Instead, we have applied the Supreme Court's decisions in *Trombetta* and *Youngblood*, focusing on materiality and good faith. *See State v. Danielson*, 2012 S.D. 36, ¶ 38, 814 N.W.2d 401, 412 (applying *Trombetta* and *Youngblood* to hold that the defendant "failed to demonstrate that the State, in bad faith, destroyed evidence that would have played a significant role in his defense"); *State v. Bousum*, 2003 S.D. 58, ¶¶ 15-16, 663 N.W.2d 257, 262-63 (stating *Trombetta's* materiality test and disposing of lost evidence claim through the application of *Youngblood's* bad faith standard); *Lyerla*, 424 N.W.2d at 911 (applying *Trombetta's* materiality test in a pre-*Youngblood* decision).

[¶30.] Applying these cases, we conclude that Zephier cannot prevail. Initially, we believe that the potential lack-of-fingerprint evidence was not material because the firearms did not possess apparent exculpatory value. The guns were found in Zephier's car, which generally matched the description of the vehicle connected to a shooting outside of a nearby residence reported a short while earlier.

Zephier was in the driver's seat of the parked car and in apparent control of it before he got out to speak with Lieutenant Bruguier. Cranmer's subsequent flight and the ensuing police chase suggested a concerted effort to conceal evidence of the stolen weapons in Zephier's car.[10] Under these circumstances, the guns did not possess apparent exculpatory value.[11]

[¶31.] At most, the guns were, in the words of *Youngblood*, "potentially useful." However, Zephier's due process argument is unsustainable because he has not established that the State or its law enforcement officers acted in bad faith. The Charles Mix County deputies did not release the guns unilaterally or in an effort to frustrate Zephier's defense. Instead, they sought guidance from the local prosecutor, and though the deputies and the prosecutor overlooked their statutory obligations to preserve evidence, the record contains no information to suggest bad faith.

[¶32.] Zephier's argument to the contrary simply focuses on the State's violation of the procedures outlined in SDCL 23A-37-15 without any additional

---

10. It appears law enforcement officers viewed the 16 firearms found in Zephier's car as exclusively inculpatory. There is no suggestion that investigators ever considered testing the weapons for fingerprint evidence to build a case against either Cranmer or Zephier.

11. Zephier's admissions during sentencing illustrate the difficulty of assessing the value of the lost opportunity to test for the absence of his fingerprints. During his statement at sentencing and in the presence of his attorney, Zephier acknowledged playing a role in the gun thefts, claiming an inverted version of Cranmer's testimony in which Zephier, not Cranmer, was the driver while Cranmer removed the firearms from Soulek's home and placed them in Zephier's car. In so doing, Zephier effectively admitted guilt for the burglary offense under an aider and abettor theory even if, as he claims, his fingerprints were not on the guns.

showing that officers or the prosecutor were acting in bad faith. We can discern nothing from the decisions of the United States Supreme Court or our own cases that supports the view that due process requires such an inflexible per se bad faith rule.

[¶33.]     Finally, the circuit court undertook appropriate remedial efforts to address the State's violation of SDCL 23A-37-15. It granted Zephier leeway to cross examine the State's witnesses regarding his inability to examine the guns. In addition, the court's instruction to the jury regarding the State's obligation to preserve evidence allowed jurors to exercise their judgment to determine the significance of the State's statutory noncompliance:

> It is the law of this state that when property is seized by law enforcement which constitutes evidence of a crime, law enforcement must safely keep such property as evidence as long as it is required for trial and must not dispose of the same without an order of the court. It is for your sole and exclusive determination whether returning the property to Joe Soulek without a court order, and the weight to be given such fact, bears upon the innocence or guilt of the defendant.

[¶34.]     In the end, the jury determined the credibility of Cranmer and Zephier and assigned what it thought was the proper weight to law enforcement's failure to preserve alleged exculpatory evidence. *See State v. Ware*, 2020 S.D. 20, ¶ 12, 942 N.W.2d 269, 272-73 (quoting *State v. Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342) ("[T]he Court 'does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence on appeal.'"). We conclude that the circuit court did not err when it denied Zephier's motions to suppress the gun evidence.

***Zephier's Motion for Expert Fingerprint Testing***

[¶35.]     We review "[a] trial court's decision regarding appointment of an expert" for an abuse of discretion.  *State v. Buchholz*, 1999 S.D. 110, ¶ 30, 598 N.W.2d 899, 905 (quoting *State v. Red Star*, 467 N.W.2d 769, 771 (S.D. 1991)).  "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'"  *State v. Delehoy*, 2019 S.D. 30, ¶ 22, 929 N.W.2d 103, 109 (quoting *Thurman v. CUNA Mut. Ins. Soc'y*, 2013 S.D. 63, ¶ 11, 836 N.W.2d 611, 616).

[¶36.]     "Trial courts should scrutinize a defense request for an expert to [e]nsure that an indigent defendant may procure any reasonable defense, and, when in doubt, lean toward the appointment of such an expert."  *Danielson*, 2012 S.D. 36, ¶ 23, 814 N.W.2d at 409 (quoting *State v. Stuck*, 434 N.W.2d 43, 51 (S.D. 1988)).  "However, 'if the request is frivolous, unreasonable, unnecessary for an adequate defense, or without underlying factual support, the appointment need not be made.'"  *Id.* (quoting *In re E.L. & R.L.*, 2005 S.D. 124, ¶ 22, 707 N.W.2d 841, 848).

[¶37.]     Here, the circuit court acted within its discretion when it denied Zephier's motion for forensic testing because he did not demonstrate the testing was necessary for an adequate defense, and the request lacked factual support.  Under the circumstances, the court correctly concluded that any fingerprint evidence, or the lack of it, that existed prior to Zephier's arrest could have been compromised when law enforcement officers and Soulek handled the guns after they were recovered, making fingerprint analysis inconclusive.  Zephier himself thought it was possible that the fingerprints had been altered, and the court's decision to deny a fingerprint expert could be affirmed on that basis alone.

[¶38.] The request was also unconnected to factual support for the premise that there was a reasonable likelihood that an expert could recover identifiable fingerprints. More to the point, Zephier submitted no evidence to support the idea that the inability to recover his fingerprints would be meaningful given the fact that it appears the guns had been handled extensively after they were seized and then returned.

[¶39.] Finally, even if the circuit court abused its discretion by denying Zephier's request for fingerprint testing, we can discern no prejudice. There was no expert fingerprint testimony at the trial, so the principal point Zephier wanted to make—that his fingerprints were not found on the guns—was essentially conceded by the State. The absence of any fingerprint evidence allowed Zephier the strategic opportunity to emphasize the State's failure to follow well-established rules for the preservation of evidence, suggest sloppy police work, and argue that fingerprint analysis would have confirmed Zephier's denial of responsibility. The court's instruction also supported Zephier's argument that the State had violated evidence preservation standards and allowed the jurors to consider the impact of the State's statutory violations when determining the question of guilt.

## Conclusion

[¶40.] The circuit court did not err when it denied Zephier's motion to exclude evidence associated with the stolen guns. Although law enforcement officers did not comply with statutory standards for preserving seized evidence when they prematurely returned the guns to Soulek, Zephier has not demonstrated that the evidence was material or that officers acted in bad faith. In addition, the court

-17-

acted within its discretion when it denied Zephier's request for fingerprint testing. The request lacked sufficient factual support, and the analysis was unnecessary to his defense. We affirm.

[¶41.] GILBERTSON, Chief Justice, and KERN, JENSEN, and DEVANEY, Justices, concur.