#30353-a-MES
**2024 S.D. 66**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

　　v.

ARNSON ABSOLU,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT GUSINSKY
Judge

* * * *

TIMOTHY J. RENSCH of
Rensch Law
Rapid City, South Dakota                    Attorneys for defendant and
appellant.


MARTY J. JACKLEY
Attorney General

MATTHEW W. TEMPLAR
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff and
appellee.

* * * *

ARGUED
APRIL 25, 2024
OPINION FILED **10/30/24**

#30353

SALTER, Justice

[¶1.]        A jury convicted Arnson Absolu of three counts of first-degree murder. Absolu moved for a new trial after discovering undisclosed information about a State witness. The circuit court denied the motion. Absolu appeals, arguing the court erred when it denied the motion for new trial because, he asserts, the State's failure to provide the information was a denial of due process and a violation of the court's pretrial discovery order. We affirm.

## Factual and Procedural Background

### *The murders of Ashley Nagy and Charles Red Willow*

[¶2.]        In the evening hours of August 24, 2020, Rapid City police officers responded to a call from a Thompson Park area resident who had heard several gunshots. Once at the park, officers observed a parked Chevrolet Tahoe SUV inside of which were two individuals with apparent gunshot wounds.

[¶3.]        In the passenger seat was a man who would later be identified as Charles Red Willow. He had suffered multiple gunshot wounds and appeared to be deceased. A female in the driver seat, later identified as Ashley Nagy, was breathing but had suffered a traumatic gunshot wound to her head. Emergency medical responders determined that Nagy was exhibiting what is known as agonal breathing and could not be saved.[1] As one emergency medical responder grimly described it, "She was dead, her body just didn't know it yet." Law enforcement officers took immediate action to preserve the crime scene.

---

1.        At trial, a paramedic who responded to the scene described agonal breathing as not being "conducive to life." Rather, it is "a reaction from the brain . . . due to insults to the brain such as hypoxia, hemorrhage, traumatic injury."

[¶4.] Detectives began their investigation without any apparent suspects or witnesses. However, after collecting video surveillance from surrounding homes and businesses, the detectives were able to identify a dark-colored Chevrolet Malibu that had driven near Thompson Park. The video showed two males getting out of the vehicle, walking towards the parked Tahoe, and then running back to the Malibu. One of the men was African American and appeared to be wearing white shoes. The other man was Caucasian and was wearing a red shirt.

[¶5.] In the initial phase of the investigation, detectives began to search for the dark-colored Chevrolet Malibu in the Rapid City area and, on a hunch, they decided to focus on two rental vehicles that were owned by Casey's Auto. The detectives learned that on the morning of the shootings, one of the Malibus had been rented by a man named Arnson Absolu. Surveillance footage from Casey's Auto that morning revealed that Absolu's appearance was generally consistent with one of the men depicted in the park video surveillance—an African American male wearing white shoes. The detectives were also told that the Malibu Absolu rented was fitted with a global positioning system, or GPS, device that was programmed to record the vehicle's location every 12 hours and could also be activated, or "pinged," to locate the vehicle in real time.

[¶6.] Detectives learned more about Absolu from interviews with Red Willow's associates. Red Willow was a known heroin dealer in the area, and the detectives quickly concluded that the common link between Red Willow, Nagy, and Absolu was the local drug trade. Interviews with Red Willow's associates revealed that Absolu was from New York and came to Rapid City to sell fentanyl-laced

heroin, known as "China White," using local dealers. Red Willow had a reputation for not paying his debts, and it was rumored that he owed Absolu a substantial amount of money for drugs and that Absolu had threatened Red Willow because of the debt.

[¶7.] Shortly after the shootings, it appeared that Absolu had traveled back to New York in the rented Malibu based upon information relayed by the car's GPS tracker. Detectives continued to monitor Absolu's location along the east coast as they continued their investigation, which ultimately led them to conclude that Absolu had murdered Red Willow and Nagy. With the assistance of the New York City Police Department (NYPD), Absolu was arrested on September 9, 2020, and transported back to South Dakota by Rapid City Police Department detectives.

[¶8.] In Absolu's rented Malibu, NYPD officers found a 9mm black semi-automatic pistol, heroin, and Absolu's cell phone. Text messages found on Absolu's phone revealed he had negotiated for the purchase of the 9mm gun and also a .40 caliber black and silver Smith & Wesson pistol that resembled a handgun later discovered by a South Dakota School of Mines student in a creek near the Rapid City fairgrounds. Officers also observed damage to the undercarriage of the rented Malibu.

### The murder of Dakota Zaiser

[¶9.] Detectives believed that the Caucasian male depicted in the park surveillance footage from the night of the park shootings resembled a man named Dakota Zaiser. The detectives were familiar with Zaiser and knew that he had been released from the Pennington County Jail wearing a red Nike t-shirt just hours

before the shootings. Phone records also showed that Zaiser had made multiple calls to Red Willow between the time Zaiser was released from jail and when the shootings occurred.

[¶10.] Zaiser's mother became concerned about her son's whereabouts the day after the shootings and contacted the Rapid City Police Department to report him missing. She explained that Zaiser maintained daily contact with her, but she had not heard from him and had been unable to reach him by phone.

[¶11.] During their initial interviews, detectives learned from one of Absolu's dealers, Breeze Stock,[2] that around 2 a.m. on August 25, a frantic and sweaty Absolu FaceTimed her, told her he had hurt somebody, and was cleaning something. Later that morning, Absolu drove the Malibu to Stock's apartment to collect money she owed him for drugs. When she went out to meet Absolu in the apartment complex parking lot, the trunk of his vehicle was open, and she saw a blue tub inside. Absolu closed the trunk and asked Stock where he could get some shovels to bury something. She told detectives that she refused to help Absolu.

[¶12.] Based on this information, detectives obtained surveillance footage of the parking lot at Stock's apartment complex. The video confirmed that on the morning of August 25, Absolu arrived at the apartment complex and parked the Malibu which remained in the parking lot through the day. In the early morning hours of August 26, the video showed a man identified as Shamar Bennett arriving at the complex. He and Absolu looked into the trunk of the Malibu and appeared to

---

2. Stock testified before the grand jury but passed away prior to trial.

engage in an animated conversation, after which they left in separate vehicles—Absolu drove the Malibu, and Bennett drove a different car.

[¶13.] Detectives located Bennett who first told them that the argument they had observed on the apartment surveillance footage related to Bennett's request to purchase heroin from Absolu. Bennett told detectives that there were some bags of China White in the trunk and that he had shown Absolu a place to conceal the drugs by driving him out of town. Bennett continued to maintain that he did not know anything about Zaiser's whereabouts.

[¶14.] That changed, however, midway through a subsequent interview when Bennett admitted to knowing where Zaiser's body was located and also admitted to helping Absolu conceal it. Approximately one month after Red Willow and Nagy were shot, Bennett brought detectives to a shallow grave near Sheridan Lake, where they discovered Zaiser's remains.

[¶15.] On January 6, 2021, a Pennington County grand jury issued an indictment charging Absolu with three separate counts of first-degree murder in violation of SDCL 22-16-4(1). Bennett was one of seven witnesses who testified before the grand jury. Absolu pled not guilty to all three charges.[3]

***The trial***

[¶16.] The jury trial began on January 9, 2023, and over the course of approximately three weeks, jurors heard testimony from 49 witnesses, including law enforcement officers and detectives, former drug dealers, and forensic

---

3. The State initially viewed this as a capital case, but it ultimately decided not to pursue the death penalty.

pathologists.  Through these witnesses, the State introduced evidence that placed Absolu's cell phone in the area of Thompson Park around the time of the shootings on August 24.  The cell phone location could also be traced to Sheridan Lake on August 26, and the State presented testimony that Absolu's rented Malibu was damaged when he hit a stump near Zaiser's grave.

[¶17.]     The State also introduced evidence of the substantial drug debt Red Willow owed to Absolu and relevant portions of the surveillance footage detectives had collected.  But of all the witnesses who testified, two were particularly notable because of their personal interactions with Absolu in the time leading up to and following the Thompson Park shootings.

[¶18.]     The first of these witnesses was Maddie Ziegler, who was a former heroin dealer and user.  She explained that Red Willow introduced her to Absolu, who she knew as "D."  Ziegler testified that she had become deeply involved in Absolu's drug distribution operation.  She assisted him with packaging the fentanyl-laced heroin and then distributing it to retail dealers in the Rapid City area.  Ziegler also explained that Absolu would stay at her apartment when he was in Rapid City.

[¶19.]     Ziegler stated that on the morning prior to the Thompson Park shootings, Absolu was agitated and brandished a gun she did not know he had been keeping in a dresser drawer.  The two argued, and Absolu accused Ziegler of "bugging" his rental car.  The two ultimately went to Casey's Auto and replaced the rental car Absolu had been driving with the Chevrolet Malibu that police had observed in the surveillance footage.  Ziegler did not hear from Absolu the rest of

the day, which she described as odd because, as one of his dealers, he managed Ziegler very closely.

[¶20.] In the early morning hours of the day after the Thompson Park shootings, Ziegler returned to her apartment and immediately noticed that her armchair and area rug were missing and had been replaced. She explained that her apartment smelled like bleach and the windows were open. In her bathroom, the shower curtain was missing and there was a "hole . . . the size of a head[,]" as she described it, in the wall next to the bathtub. Absolu was in the apartment, and when she asked him why her chair and rug were missing, he stated that he had replaced them after he had experienced severe diarrhea and soiled them. When she asked about the missing shower curtain, his response was simply that he had purchased a new one. Ziegler had already heard about the Nagy and Red Willow shootings and had seen a concerned Facebook post from Zaiser's mother about her missing son. She suspected Absolu was involved somehow but did not inquire further.

[¶21.] When asked about Absolu's demeanor that morning, Ziegler said he was "very sweet" and "in a good mood[,]" which struck her as unusual since he had been angry and armed with a gun the previous day. He gave her drugs and left the apartment. Ziegler testified that she did not see Absolu again, but she later called him to ask if he had heard from Zaiser. Absolu claimed, at first, to not know Zaiser and then said he did not know of Zaiser's whereabouts. Absolu told Ziegler he was leaving town and not coming back. He had left some drugs with another associate who, he said, could supply Ziegler. According to Ziegler, Absolu had never before

left town prior to selling all of the drugs that he had brought with him from New York.

[¶22.] The other witness to have close contact with Absolu in the time surrounding the fateful events of August 24 was Bennett. At the outset of his testimony, Bennett testified that he had signed an immunity agreement with the State that shielded him from criminal liability in exchange for his truthful testimony. He also admitted that he had received immunity for testifying before the grand jury and acknowledged he was a convicted felon.

[¶23.] Bennett testified that in August 2020, he was involved in the Rapid City drug trade and was introduced to Absolu by a friend. Bennett stated that Absolu contacted him on August 24 or 25 and asked Bennett to help him dispose of a chair and a rug. Bennett agreed and, after the chair and rug were gone, he explained that Absolu "pretty much" told him that he was "trying to find somewhere to hide a body."

[¶24.] When the two met later on the morning of August 26 in the apartment complex parking lot, as depicted in the surveillance video, Absolu opened the trunk of his rented Malibu, and Bennett saw an arm and leg protruding from a blue tub—not drugs, as Bennett had initially told detectives.[4] Bennett stated that Absolu told him the body was Zaiser's and that he had "thumped him[,]" which Bennett testified meant that Absolu "admitted to [killing him] without admitting to it." Bennett explained he then became upset with Absolu and told him to leave town with the

---

4. The front of Absolu's car faced the surveillance camera, and the car's position and the open trunk lid prevented a view inside the trunk on the recorded footage.

body and not involve anyone else. But, in exchange for drugs and money, Bennett agreed to help Absolu dispose of the body.

[¶25.] Bennett testified that the two men drove to Sheridan Lake in separate cars. He stated that Absolu hit a tree stump and caused some damage to the rented Malibu as he pulled off the side of the road to park his car. Once parked, Bennett and Absolu carried the blue tub containing Zaiser's body until the tub broke, and the body fell out. After carrying the body a little further, the men stopped and found a low spot where they placed the body. Bennett laid a few branches to cover Zaiser's body but returned to the parked cars and left Absolu to finish concealing the body on his own. About ten minutes later, Absolu returned, and the two men left in their separate cars. Bennett never spoke to Absolu again.

[¶26.] Bennett also described his interaction with detectives when they confronted him a few weeks later. He acknowledged that he was not truthful during this first interview because he was protecting himself and Absolu. Later, during his second interview, Bennett explained that he decided to tell the truth after concluding that Absolu would not protect him. He ultimately took detectives to Zaiser's body.

[¶27.] Defense counsel's cross-examination of Bennett focused primarily on three things. First, defense counsel pressed Bennett on what Absolu actually said to him about Zaiser, challenging Bennett's statement that Absolu told Bennett that he had killed Zaiser. Defense counsel also challenged Bennett's statement that he did not receive any benefit from the State, pointing particularly to unrelated

charges he had faced that were ultimately dismissed.[5]  Finally, and most extensively, defense counsel asked Bennett about the "dozens and dozens and dozens" of lies he had told detectives during his first interview with them.  Defense counsel questioned Bennett about individual lies in succession, and Bennett confirmed each was, in fact, a lie he had told.

[¶28.]      Absolu's theory of the case was focused on creating reasonable doubt that he was the person who killed Red Willow and Nagy.  Absolu argued that the African American male depicted in the Thompson Park surveillance video appeared to be taller than Zaiser, who was 5'10" and "roughly the same height" as Absolu.  Absolu contrasted this with the fact that Bennett was 6'1" and also an African American.  And as to Zaiser's murder, Absolu claimed the roles were reversed— Bennett murdered Zaiser and asked Absolu to help cover it up.

[¶29.]      The case was submitted to the jury, and on January 26, 2023, the jury returned a guilty verdict on all three counts of first-degree murder.

***The unrelated infant death and abuse and neglect case***

[¶30.]      Prior to sentencing, Absolu made a motion to continue and also a motion that was styled as a "Motion for Review and Preservation of Undisclosed Primary Witness Information[.]"  At a related hearing, Absolu's defense counsel explained that, after the trial had concluded, he asked the prosecutor whether

---

5.    Bennett's statement on cross-examination that he was not receiving any benefit for his testimony came in response to a leading question and may have been unexpected in light of Bennett's earlier testimony about the details of his immunity agreement.  On redirect examination, Bennett clarified that he was not receiving any *additional* benefit beyond the immunity agreement.

Bennett had been involved in the death of an infant, though what may have prompted the inquiry is not well-developed in the record.

[¶31.]     The prosecutor responded by acknowledging that, approximately two months prior to trial, in November 2022, an infant had died under what appeared to be non-accidental circumstances while in the care of Bennett and his girlfriend. The prosecutor learned of the incident and investigation just weeks before trial began and indicated that Bennett was not a suspect. In light of the request, however, the prosecutor provided Absolu's counsel with the relevant police reports, which, Absolu alleged, contained material that should have been disclosed as part of the State's *Brady* obligation and pursuant to the court's pretrial discovery order.[6] Absolu asked the court to conduct an in-camera review of a related, but undisclosed, abuse and neglect (A&N) file, concerning other children affected by the infant's death. The State opposed the request, citing the confidential nature of A&N records.

[¶32.]     The circuit court denied the motion to continue Absolu's sentencing and sentenced him to three consecutive mandatory life sentences. However, the court agreed to review in-camera the evidence relating to the infant-death case,

---

6.     In *Brady v. Maryland*, the United States Supreme Court held that the defendant's due process rights were violated when favorable evidence was withheld by the State. 373 U.S. 83, 87, 83 S. Ct. 1194, 1196−97, 10 L. Ed. 2d 215 (1963). *Brady* was later extended to impeachment evidence, *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985), and the resulting rule imposes an obligation upon prosecutors to unilaterally disclose what is now commonly known as *Brady* material. *See infra* ¶ 38.

including the A&N records, stating the motion was "essentially a precursor to a motion for a new trial[,]" which Absolu subsequently filed.

[¶33.] After completing its in-camera review, the circuit court denied Absolu's motion for a new trial in a memorandum opinion and order. Though it reviewed all of the material and included it in the record under seal, the court drew a distinction between the police reports relating to the infant's death and the A&N records themselves:

> The materials include police investigative records as well as Abuse and Neglect (A&N) records. The State argues that records involving A&N proceedings are confidential and are not accessible except to the attorneys and staff directly involved in the A&N proceeding. The description provided herein is from the police investigation. The A&N records rely on the same police investigative records. While the A&N records offer opinions and conclusions by Family Service Specialists and the civil State's Attorney in charge of A&N cases, for the reasons set forth below, they are not relevant.

[¶34.] The circuit court's "not relevant" comment appears to relate to information indicating that a Department of Social Services (DSS) employee had described Bennett as a "suspect" in the infant's death. The court explained that whether Bennett had been classified as a suspect by DSS was not the critical inquiry under *Brady*, which instead focused on the type of information actually available to the prosecutor. In that regard, the court determined that the police reports that mention Bennett in connection with the investigation into the infant's death should have been provided to Absolu because they were favorable to the defense under *Brady*. In the court's view, this information would have allowed Absolu to impeach Bennett and suggest to the jury that Bennett had further motivation to testify in a manner favorable to the State at the trial.

[¶35.]	However, despite concluding the information was *Brady* material, the circuit court also found that Absolu was not prejudiced by the State's failure to disclose the evidence because Absolu was able to thoroughly cross-examine Bennett about, among other things, his immunity agreement and his initial lies to detectives. The court also noted that Bennett's trial testimony was consistent with his grand jury testimony, which the court concluded neutralized Absolu's argument that Bennett was motivated to lie in an effort to obtain favorable treatment from the State in the recent infant-death case:

> Bennett testified in a manner consistent with his grand jury testimony . . . . Bennett's trial testimony was not more favorable to the State than this grand jury testimony. Bennett provided his grand jury testimony on January 6, 2021. *Therefore, he could not have been motivated by the events that were about to occur in November 2022.*

(Emphasis added.)

[¶36.]	Absolu appeals, arguing the circuit court abused its discretion by denying his motion for a new trial because the State failed to disclose evidence in violation of the court's discovery order and in violation of *Brady*.

## Analysis and Decision

[¶37.]	"The Due Process Clause of the Fourteenth Amendment imposes upon states the requirement to ensure that 'criminal prosecutions . . . comport with prevailing notions of fundamental fairness.'" *State v. Zephier*, 2020 S.D. 54, ¶ 20, 949 N.W.2d 560, 565 (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413 (1984)). This includes the requirement that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *Id.* (citation omitted). "The resulting body of decisional law from the United States

Supreme Court and this Court exists under a topical heading that 'might loosely be called the area of constitutionally guaranteed access to evidence.'" *Id.* (quoting *Trombetta*, 467 U.S. at 485, 104 S. Ct. at 2532).

[¶38.] Included within this area is a prosecutor's obligation under *Brady* to disclose evidence that is "either material to the guilt of the defendant or relevant to the punishment to be imposed." *Id.* ¶ 21 (quoting *Trombetta*, 467 U.S. at 485, 104 S. Ct. at 2532) (discussing *Brady*); *see United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule."); *see also United States v. Agurs*, 427 U.S. 97, 110, 96 S. Ct. 2392, 2401, 49 L. Ed. 2d 342 (1976) (holding that prosecutors must disclose exculpatory evidence that would raise a reasonable doubt about the defendant's guilt, even in the absence of a specific request). "Whether the prosecution's suppression of this type of evidence will lead to a due process violation that results in a new trial turns on the materiality of the suppressed evidence—not the good faith or bad faith of the prosecutor." *Zephier*, 2020 S.D. 54, ¶ 21, 949 N.W.2d at 565 (citing *State v. Birdshead*, 2016 S.D. 87, ¶ 18, 888 N.W.2d 209, 215).[7]

[¶39.] The United States Supreme Court and our own case law have identified three components of a *Brady* violation: "The evidence at issue must be

_____

7.  Claims that a defendant's due process rights have been violated are reviewed de novo. *State v. Apple*, 2008 S.D. 120, ¶ 8, 759 N.W.2d 283, 286. We otherwise review the denial of a motion for a new trial itself for an abuse of discretion. *State v. Timmons*, 2022 S.D. 28, ¶ 19, 974 N.W.2d 881, 888. "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices." *State v. Mitchell*, 2021 S.D. 46, ¶ 27, 963 N.W.2d 326, 332 (quoting *State v. Rice*, 2016 S.D. 18, ¶ 23, 877 N.W.2d 75, 83).

favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Birdshead*, 2016 S.D. 87, ¶ 18, 888 N.W.2d at 215 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999)).

[¶40.]     In this case, the State concedes that the suppression element is met because it did not disclose the information relating to the infant-death investigation.[8]  However, it maintains the evidence was not favorable and, in any event, its non-disclosure did not prejudice Absolu.

[¶41.]     The Eighth Circuit Court of Appeals has held that "[a] witness's nebulous expectation of help from the state is not *Brady* material [because,] absent evidence that the State communicated an agreement that it would consider rewarding [a witness's] testimony, there [is] nothing for the government to disclose." *Moore-El v. Luebbers*, 446 F.3d 890, 900 (8th Cir. 2006) (cleaned up).  One might hope for, or even expect, favorable treatment in exchange for a witness's testimony. But without evidence to support it, this hope alone does not implicate *Brady* under the attenuated theory that the State is an unwitting participant in a tacit

---

8.     Before the circuit court, the State noted the confidential nature of A&N investigations and claimed that, despite being told by a law enforcement officer that an infant had suffered a non-accidental death while in Bennett's care, it had no knowledge of the A&N investigation.  It is true that A&N investigations are confidential pursuant to SDCL 26-8A-13, but because the prosecutor's office is a single entity, *Giglio v. United States,* 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), information in the possession of any one prosecutor in the prosecutor's office is imputed to all others for the purposes of *Brady*.  *Smith v. Sec'y of N.M. Dep't of Corrs.*, 50 F.3d 801, 824 (10th Cir. 1995); *State v. Etienne*, 35 A.3d 523, 549–50 (N.H. 2011); *State v. Williams*, 896 A.2d 973, 990 (Md. 2006).

agreement with a testifying witness that renders all unrelated information about the witness in its possession subject to compulsory disclosure. *Id.*; *Knox v. Johnson*, 224 F.3d 470, 482 (5th Cir. 2000) (holding a unilateral hope for favor is not *Brady* material). "[T]here must be some assurance or promise from the prosecution that gives rise to a *mutual* understanding or tacit *agreement*." *Akrawi v. Booker*, 572 F.3d 252, 263 (6th Cir. 2009).

[¶42.]     Under the circumstances, we question whether the material related to the infant's death was even subject to disclosure under *Brady*. There is no evidence of any agreement, formal or informal, that Bennett made with the State in connection to the infant-death case. And any unilateral hope that Bennett may have had for leniency in the infant-death case was unaccompanied by an objective basis in fact. Bennett testified at trial that his immunity agreement was the only benefit he was receiving, or expected to receive, in exchange for his testimony.[9]

[¶43.]     However, we need not definitively resolve the question of whether the information was favorable impeachment evidence under *Brady* because it appears, in any event, as though it was subject to disclosure under the perceptibly broad terms of the circuit court's discovery order, which required the State to disclose the following:

> Any and all consideration or promises of consideration given to or on behalf of each witness or expected or hoped for by the witness. *"Consideration" means absolutely anything, bargained*

---

9.     Notably, Bennett's immunity agreement with the State relating to his role as an accessory to the murders at issue in this case excluded immunity for any crimes of violence. Given this limitation, the suggestion that Bennett was testifying with the hope of receiving further leniency from the State with respect to his suspected involvement in the unrelated death of an infant is even more attenuated.

> *for or not, which arguably could be of value or use to the witness* or to person of concern to the witness, including but not limited to formal or informal, direct or indirect leniency, favorable treatment or recommendation or other assistance with respect to any pending or potential criminal, parole, probation, pardon, clemency, social services matter, civil matter, administrative matter or other dispute involving the State of South Dakota.

(Emphasis added.)[10]

[¶44.]     This sweeping language from the discovery order seems to contemplate that the State would be required to disclose that Bennett may expect or hope for leniency in the infant-death case, "bargained for or not[.]"  The State's failure to do so violates this provision of the circuit court's discovery order.  But this determination does not end our inquiry because we must determine the impact of the non-disclosure by considering whether it was prejudicial to Absolu.  *State v. Krebs*, 2006 S.D. 43, ¶ 19, 714 N.W.2d 91, 98 ("[If] a discovery order is violated, the inquiry is whether the defendant suffered any material prejudice as a result of the late disclosure.").[11]

[¶45.]     We have recently clarified that, to prove prejudice, a defendant must prove "a reasonable probability that, but for the error, the result of the proceeding would have been different.  In other words, a probability sufficient to undermine confidence in the outcome."  *State v. Richard*, 2023 S.D. 71, ¶ 31, 1 N.W.3d 654, 662

---

10.    The State stipulated to the discovery order that was proposed by the defense.

11.    The circuit court did not address Absolu's claim that not disclosing the material related to the infant's death violated the court's discovery order, perhaps given its determination that this information should have been disclosed under *Brady*.  However, both parties have addressed the discovery order issue on appeal, and, under either theory, the critical analysis in this case relates to prejudice, not disclosure.

(quoting *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686) (cleaned up).  This test is essentially the same standard used to determine materiality under *Brady*.  *Compare id.* (describing the prejudice test), *with Birdshead*, 2016 S.D. 87, ¶ 18, 888 N.W.2d at 215 (stating that "evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); *see also United States v. Wilson*, 481 F.3d 475, 480 (7th Cir. 2007) (stating that materiality "is the same thing as prejudice").

[¶46.]        In the context of *Brady*, failing to disclose impeachment evidence is not material, or prejudicial, when it "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) (quoting *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996)); *see, e.g.*, *Clay v. Bowersox*, 367 F.3d 993, 1000 (8th Cir. 2004) (holding the evidence was not material where, in part, the witness's credibility had already been attacked); *Moore-El*, 446 F.3d at 901 (same); *Shabazz v. Artuz*, 336 F.3d 154, 166 (2d Cir. 2003) (same).  "[I]f the information withheld is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness, it is not material." *United States v. Spinelli*, 551 F.3d 159, 165 (2d Cir. 2008); *cf. Amiel*, 95 F.3d at 145 ("Evidence of impeachment is material if 'the witness whose testimony is attacked supplied the only evidence linking the defendants to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case.'" (quoting *Wong*, 78 F.3d at 79)).

[¶47.]     Absolu asserts the failure to disclose the information regarding the infant-death investigation was prejudicial.  He claims he could have used it to illuminate Bennett's bias towards the State which translated into favorable testimony in the hope of obtaining leniency in the infant-death case.  In Absolu's view, had he been able to question Bennett using the undisclosed information, there is a reasonable probability the outcome of the trial would have been different.  But based upon our review of the entire trial record, we cannot accept this argument.

[¶48.]     Bennett's trial testimony was consistent with his testimony before the grand jury and no more favorable to the State, as the circuit court correctly noted.  Consequently, there is no logical basis for determining that Bennett became motivated to provide testimony that was adverse to Absolu shortly before trial as a result of the incident involving the infant's death that occurred almost two years *after* he provided the same testimony to the grand jury.

[¶49.]     This is not to say that there was no evidence of Bennett's motivation to lie at Absolu's trial.  There was.  Bennett received immunity from the State for his testimony before the grand jury and at trial, and the details of the immunity agreement were laid bare before the jury along with Bennett's dishonesty with detectives, particularly in his first interview.

[¶50.]     Absolu acknowledges that he had the opportunity to attack Bennett's credibility on cross-examination with this information and by also asking Bennett about other, unrelated drug charges and a probation violation that had been brought against him but dismissed during the pendency of the case.  Nevertheless,

Absolu contends that "[t]he fact that he had not been charged in this child's death would have been the straw that broke the camel's back."

[¶51.] We believe Absolu overstates the significance of this evidence in two respects. First, the information was not fundamentally different from the other impeachment evidence Absolu used effectively at trial. The idea that Bennett had a motive to lie because of his immunity agreement that protected him from *actual* criminal jeopardy for assisting Absolu by disposing of Zaiser's body and lying to the police seems like a more direct and compelling form of impeachment than the attenuated claim that Bennett could *potentially* receive favorable treatment for a recent, unrelated infant-death investigation that had apparently not concluded. It seems unlikely the jury would discredit Bennett as a witness based on an inchoate hope for leniency in the infant-death case if the jury did not already discredit him based on his actual immunity agreement with the State for his conduct in this case.

[¶52.] Presumably, Absolu would have used the undisclosed information as he did with the information that Bennett's unrelated drug charge and probation violation cases had been dismissed. For these, Absolu impeached Bennett, without objection, using questions suggesting they were further evidence of favorable treatment beyond the immunity agreement.[12] But once he was confronted with the prospect that he was testifying in the hope of obtaining favor with the State in the recent infant-death case, any utility in the voluminous information relating to the

---

12. Bennett denied that his testimony had anything to do with the dismissal of his drug charge and probation violation cases. On redirect examination, he testified that both were dismissed as part of his successful completion of a court-approved probationary diversion program.

police investigation and the A&N records would have been at an end.[13]  However, Absolu's argument seems to contemplate a more prominent use for this evidence, which prompts our second observation regarding his overestimation of the infant-death information.

[¶53.]     The use of information from the A&N investigation would have been significantly restricted by the rules of evidence.  Although Absolu acknowledges, for the most part, that the undisclosed information implicated an impeachment theory, not an exculpatory theory, he also suggests that the evidence would have assisted him in his argument that the taller Bennett—not Absolu—was depicted in the Thompson Park surveillance video.[14]  This evidence seems less related to impeachment and more an effort to claim that Bennett killed the infant, making it more likely that he was also involved in the Thompson Park shootings.  *See State v. Little Long*, 2021 S.D. 38, ¶ 38, 962 N.W.2d 237, 251 (stating that "[i]mpeachment evidence is evidence introduced into the record for the limited purpose of attacking a witness's credibility[,]" whereas substantive evidence is admitted for the truth of a proposition).  But any such use would be contrary to SDCL 19-19-404(b) because there is no identified "non-character" purpose for which to offer the information.  *See* SDCL 19-19-404(b) (limiting exceptions to other acts evidence to non-character

---

13.  For this reason, our review of the sealed material was not that helpful to our analysis.  The voluminous material cannot be used to *prove* Bennett is responsible for the infant's murder; at most, it would only ever be used to suggest Bennett was motivated to lie.

14.  In his brief, Absolu states, "A reasonable doubt exists for a witness in a murder case and his credibility when he is facing the possibility of his own prosecution for another murder."

purposes such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, and lack of accident).

[¶54.] Beyond this, the investigative material appears ill-suited to admission under the impeachment rules. Bennett had not been charged in connection with the infant's death, much less convicted. *See* SDCL 19-19-609 (restricting impeachment to a criminal conviction). And extrinsic evidence is generally not permitted for impeachment under SDCL 19-19-608. Notably, Absolu did not ask Bennett if he was depicted with Zaiser in the Thompson Park surveillance video.

[¶55.] Other considerations also support the view that not disclosing information about the infant-death investigation did not prejudice Absolu. Even without the evidence, Absolu was able to develop his defense that Bennett killed Red Willow, Nagy, and Zaiser.[15]

[¶56.] And the State's case was strong. Bennett's testimony was corroborated by other evidence, including Ziegler's testimony that Absolu had hastily disposed of the rug and chair from her apartment, photographs that revealed damage to Absolu's rented Malibu that were consistent with hitting a tree stump, and the apartment surveillance footage depicting Absolu showing Bennett something in the trunk of his car that prompted an argument between the two.

---

15. The State contends that Absolu's claim that Bennett was the murderer violated the circuit court's discovery order requiring disclosure of third-party perpetrator evidence. Absolu claims that the arguments he made were simply comments in response to the State's case-in-chief. Regardless, as Absolu points out, the State made no objection at trial, and the issue is not before us on appeal.

[¶57.] In addition, the State presented photographs found on Absolu's phone of a .40 caliber Smith & Wesson gun that were consistent with the .40 caliber Smith & Wesson gun found in an area creek. Also found on Absolu's phone were images saved from internet searches on how to make lye, a cleaning agent that can also be used to dissolve tissue. Further, Absolu was seen on surveillance video from Casey's Auto the morning of the Thompson Park shootings renting the Malibu that appears to be depicted in the Thompson Park surveillance footage. And even if Absolu's identification in this video was not certain, he is unquestionably driving the Malibu in the apartment surveillance video when he meets up with Bennett *who is driving a different car.*

[¶58.] Also, evidence relating to the location of Absolu's cell phone and the GPS-equipped Malibu corresponded to the areas of Thompson Park at the time of the shootings and to Sheridan Lake around the time it appears that Zaiser's body was placed there in a shallow grave. And lastly, Absolu did not challenge his involvement in the Rapid City drug trade, which explained his motive to kill Red Willow—a drug debt—and Nagy and Zaiser—as witnesses.

## Conclusion

[¶59.] We conclude that, although the broad language of the circuit court's discovery order would include at least some of the information relating to Bennett's involvement in the infant-death investigation, Absolu cannot prove he was prejudiced by the State's failure to disclose it. Therefore, the circuit court did not err when it denied Absolu's motion for a new trial.

#30353

[¶60.]     JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN,

Justices, concur.