#30588-a-JMK
**2025 S.D. 18**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

DREAU LESTER ROGERS,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MICHAEL W. DAY
Judge

* * * *

ROBERT J. ROHL
Rapid City, South Dakota                    Attorney for defendant
                                            and appellant.


MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.

* * * *

ARGUED
OCTOBER 1, 2024
OPINION FILED **03/12/25**

#30588

KERN, Justice

[¶1.]　　　　A jury convicted Dreau Rogers for the second-degree murder of his wife, Destiny Rogers, and of several additional offenses. He was sentenced to life in prison. The tenet of Rogers's defense at trial was that Donovan Derrek, an alleged third-party perpetrator, shot and killed Destiny. Rogers appeals alleging that the circuit court erred by denying his motion for judgment of acquittal and by failing to give Rogers's requested spoliation instruction which he claims was warranted by the State's failure to properly analyze the data on Derrek's phone before returning it to him. He contends that the return of Derrek's phone without notice to the defense, and its subsequent destruction, constituted a due process violation under the Fourteenth Amendment to the United States Constitution because he was denied material and potentially exculpatory evidence—namely the location data from Derrek's phone at the time of the murder. We affirm.

**Factual and Procedural Background**

[¶2.]　　　　Around 9:00 a.m. on January 21, 2022, Destiny Rogers went to the Common Cents Convenience Store in Spearfish. Destiny asked Carolyn Neimi, the store manager, if she could charge her phone while she waited for a cab to take her to Rapid City. Neimi testified that Destiny talked on the phone with her husband, Dreau Rogers, and it sounded as though they argued. Destiny told Rogers that she was going to pick up her car in Rapid City and was waiting for a cab. Neimi indicated that Destiny was "very adamant that she would not be riding with [Rogers]" to pick up her car and that she "made a comment about his attitude not being right." Rogers arrived at Common Cents and prepaid for gas at 9:33 a.m.

-1-

Destiny briefly got in Rogers's car, but then re-entered Common Cents at 9:35 a.m. and Rogers left. Destiny stayed in the area of the Common Cents until approximately 10:00 a.m. before she left.

[¶3.] Later that evening, Destiny was at Rogers's house in Spearfish. They were alone in the house, sitting on the couch in the living room. Rogers contests what happened next. However, "we restate the evidence and testimony 'in a light most favorable to the jury's verdict.'" *State v. Seidel*, 2020 S.D. 73, ¶ 2, 953 N.W.2d 301, 305 (citation omitted).

[¶4.] At 12:48 a.m. on January 22, 2022, Rogers called 911 requesting an ambulance. When the dispatcher asked for additional information, Rogers simply urged the dispatcher to hurry and stated that he would explain when help arrived. Officer Hunter Bradley arrived first on scene and was ushered into the house by Rogers, who was visibly sweating and out of breath, despite it being cold outside. Once inside, Officer Bradley discovered Destiny lying on the living room floor, motionless. It appeared that she had been shot in the upper right arm and was not breathing. Rogers told Officer Bradley that he had attempted CPR before Officer Bradley arrived. However, when Officer Bradley started chest compressions, he felt Destiny's ribs and cartilage pop which he later explained were indicia that CPR had not previously been done. The ambulance arrived and transported Destiny to the hospital where she was pronounced dead.

[¶5.] Rogers was interviewed by law enforcement officers at the scene and immediately identified Donovan Derrek as the shooter. He stated that Derrek came to the house, and they got into an argument. Rogers reported that he turned to

walk away, heard a noise, and then saw Destiny fall to the ground. Rogers told law enforcement that he believed Derrek intended to shoot him but missed and hit Destiny. After the gunshot, Rogers stated that Derrek fled out the back door, which was the main door to the residence, and left the area in a Mazda 6 vehicle.

[¶6.] Law enforcement completed a search of Rogers's residence pursuant to a search warrant and discovered two firearms: a holstered .45 caliber semiautomatic handgun located under a wooden landing in the backyard, and a .22 caliber revolver found in a dresser drawer. The search also revealed a wooden box on the kitchen counter containing a bag of .45 caliber bullets. The .45 found under the landing had a magazine containing several unspent bullets and a round in the chamber.

[¶7.] Law enforcement transported Rogers to the Spearfish Police Department for further questioning. At the time, law enforcement did not believe that Rogers was a suspect. He was not arrested and was interviewed as a witness. Over the course of several hours, Rogers was interviewed four times.[1] Some portions of Rogers's rendition of the events of the evening remained consistent throughout the interviews. He reported that he and Destiny were home alone sitting on the couch in the living room when Derrek knocked "aggressively" on the door. Rogers stated that although he and Destiny were married, they had not been speaking to each other for six months. He explained that they had recently

---

1. Rogers was not handcuffed and had access to his cell phone in the interview room during all four interviews. At the beginning of the third interview, Rogers was advised of his rights under *Miranda* and he agreed to waive his rights and speak to the officers. Rogers was again reminded of his rights at the beginning of the fourth interview.

reconciled, and that they were "happy" and not fighting that evening. Rogers claimed that he did not have firearms or ammunition in the house and that he and Destiny were not using drugs.[2]

[¶8.]        Other parts of Rogers's story changed throughout the interviews, particularly Derrek's location in the house at the time the shot was fired. Rogers reported in the first two interviews that Derrek fired the shot while standing in the doorway at the entrance to the house. In the third interview, Rogers placed Derrek further inside the house. He stated that when Derrek came in the door, Rogers was standing where the carpet meets the linoleum,[3] and the gun was "probably, with [Derrek's] reach, um, I mean he'd have had to have been basically -- basically right next to me." In the fourth interview, Rogers stated that Derrek was inside the house, standing "right where the carpet meets the linoleum" when he fired the shot.

[¶9.]        Rogers also provided inconsistent statements about the gun used by Derrek. Initially, Rogers stated that he did not see Derrek pull out the gun because he was turning to walk away when Derrek pulled the trigger. However, later, Rogers stated that he saw Derrek pull the gun out of his pocket before the shot was fired. Rogers also initially stated that he did not know Derrek had firearms, but

---

2.    Evidence at trial established that these statements were not true. Both Destiny and Rogers had methamphetamine in their systems and law enforcement discovered a .22 pistol and a bag of .45 caliber ammunition inside Rogers's house while executing the search warrant.

3.    Photographs of Rogers's house show that entry into the house through the back door leads directly to the kitchen which has a linoleum floor. Several feet inside, the flooring transitions to carpet where the kitchen meets the living room.

later, Rogers stated that he had seen the gun before, and that Derrek previously tried to sell Rogers a gun.

[¶10.]     Meanwhile, the Special Response Team (SRT) was called from Rapid City to apprehend Derrek.  SRT responded with an "all team callout" including twenty "entry guys," eight snipers, dispatch, and crisis negotiators.  The SRT believed that Derrek was at his house and that there were two children inside.  The crisis negotiators coordinated with the children's grandparents to bring them out of the home prior to apprehending Derrek.  Derrek noticed his children leaving the home and followed them out, where he was apprehended without incident by Detective Chad Sayles and transported to the Spearfish Police Department.

[¶11.]     Detective Sergeant Steve Hofman and Detective Shawn Fox with the Spearfish Police Department interviewed Derrek and did not initially tell him why he had been arrested or about Destiny's death.  Derrek told the officers that he could not believe a SWAT team was used to make an arrest for a "dope" offense.  Derrek openly admitted that he was a methamphetamine addict, pointing to his arms and legs which were covered with sores and bruises.[4]  The detectives asked Derrek to explain where he was during the evening hours of January 21 through the early morning hours of January 22.  Derrek stated, "I just told that cop, this is gonna be embarrassing when you find out where I was last night . . . I was at some dude's house getting my dick sucked cause I was high on meth."

---

4.     Special Agent Cody Lineberger took photos of the bruises on Derrek's legs and small cut marks on Derrek's forearms.  Special Agent Lineberger testified that Derrek told him the cuts and marks were from intravenous drug use.

[¶12.] When asked about his whereabouts earlier on January 21, Derrek reported that he went to Rogers's house around 11:00 a.m. because he had not heard from Rogers in a week and a half, which was unusual. Derrek knocked on the back door twice and knocked on Rogers's bedroom window, with no response. Derrek left without seeing Rogers and drove to a mutual friend's house, where Derrek got a more recent phone number for Rogers. Derrek called Rogers later that night, between 9:00 p.m. and 10:00 p.m., and Rogers stated that he was busy and would call him back.

[¶13.] Derrek told the detectives that throughout the day on January 21, he was texting and messaging Alan Reddy, a man he met on Grindr, a dating site, two days prior. They arranged to meet at Reddy's house for a sexual encounter that evening. Derrek said that he went to Reddy's house around 11:30 p.m. on January 21 and left around 1:20 a.m. on January 22. When Detectives Hofman and Fox revealed that they were investigating a murder that occurred at 12:48 a.m., Derrek said, "check my phone . . . my phone says exactly where I was and what I was doing."[5]

[¶14.] Law enforcement interviewed Reddy at his home later in the morning on January 22. Reddy relied on the text messages between himself and Derrek to establish a timeline. He stated he was visiting a friend in Rapid City and got back to his house at approximately 10:50 p.m. on January 21. Reddy indicated that at 11:50 p.m., Derrek texted that he was leaving his house and Derrek arrived at

---

5. All three of Derrek's recorded interviews were published to the jury. The first two interviews were conducted on January 22 and the third interview was conducted on January 28.

Reddy's shortly after because he lived only two or three blocks away. Reddy initially estimated that Derrek was at the house for about an hour and believed that Derrek left at 12:45 a.m. or 12:50 a.m. However, Reddy recalled that he had taken a picture of Derrek's penis right before Derrek left. When reviewing the timestamp on the photo, Reddy stated, "I am off on my time" because the photo was taken at 1:23 a.m. and Derrek left Reddy's house shortly after the picture was taken. Reddy allowed law enforcement to take photos of the messages he and Derrek sent back and forth that evening and early morning. The texts also revealed that at 1:42 a.m., Derrek texted Reddy thanking him for the evening and referencing the sexual encounter.

[¶15.] Derrek was subsequently released from custody. On January 27, Reddy again met with law enforcement, and reported that Derrek showed up at Reddy's house on January 26 and apologized for getting Reddy involved. In the interview, Reddy stated that Derrek told him that he and Rogers had been in a "physical altercation" on January 21, but Reddy did not know what the fight was about or where it occurred.

[¶16.] On February 2, 2022, Rogers was indicted by a Lawrence County grand jury on eleven counts, namely: Count 1: first-degree murder or, in the alternative, Count 1A: second-degree murder; Count 2: possession of a firearm by a person with a prior felony drug conviction (.45 caliber pistol); Count 3: possession of a firearm by a person with a prior felony drug conviction (.22 caliber pistol); Count 4: possession of a firearm with altered serial number; Counts 5 and 6: commission of a felony armed with a firearm; Count 7: possession of a controlled substance

(methamphetamine); Count 8: possession of more than five grams of methamphetamine with intent to distribute or, in the alternative, Count 8A: possession of a controlled substance (methamphetamine) with intent to distribute; Count 9: possession of a controlled substance (clonazepam); Count 10: ingestion of a controlled substance (methamphetamine); and Count 11: possession of a controlled substance (amphetamine). The State filed a part II information, alleging four prior felony convictions. On Rogers's motion, the circuit court severed counts 6, 7, 8, 9, and 11.

[¶17.]		The State filed a motion in limine requesting that Rogers disclose any third-party perpetrator evidence before trial. Rogers filed a written response disclosing Derrek as an alleged third-party perpetrator. The circuit court held a hearing on the issue and determined the third-party perpetrator evidence was admissible under SDCL 19-19-401 and SDCL 19-19-403. The State also moved to admit evidence of other acts, pursuant to SDCL 19-19-404(b), involving Rogers's threats of domestic violence against Destiny. The circuit court granted the State's motion in part and denied it in part, admitting certain text messages from Rogers to Destiny dated October 8, 2020.

[¶18.]		During a nine-day jury trial, the State called thirty witnesses and admitted 123 exhibits in its case-in-chief. Rogers called no witnesses but presented his theory of the case through cross-examination of the State's witnesses and by challenging the veracity of the State's evidence. In addition to the recorded interviews of Rogers, Derrek, and Reddy, the State presented testimony from law enforcement officers, a pathologist, analysts, and forensic scientists.

[¶19.] Forensic pathologist Dr. Don Habbe conducted an autopsy on Destiny's body. He explained that the bullet entered Destiny's right arm. Dr. Habbe identified abrasion marks on the skin surrounding the bullet hole which were independent of the marks created by friction when the bullet passed through the skin. He specifically highlighted two marks which he testified were "caused by the tip of the [gun] barrel." These marks led Dr. Habbe to conclude that "when the trigger [was] pulled . . . the gun [was] very close to [Destiny's] arm." Dr. Habbe stated that the bullet created a "straight across" wound meaning that once fired, the bullet went through Destiny's right arm, fracturing it, then hit her right lung, aorta, and left lung. He recovered the bullet from the soft tissue in the left side of her chest. Dr. Habbe determined that the cause of death was a gunshot wound to the chest.[6]

[¶20.] Sergeant Kevin Kinney from the South Dakota Highway Patrol captured a 3D scan of Rogers's home. He explained that the scan creates a "digital twin" of the scene so that distances can later be measured. At the State's request, Sergeant Kinney measured the distance from the door frame, where Rogers initially reported Derrek was standing when he fired the shot, to where Destiny's body was located, which was approximately 22 feet. Sergeant Kinney also measured the distance from where the linoleum met the carpet, where Rogers reported Derrek was standing in his later interviews, to where Destiny's body was located, which

---

6. A toxicology screen of Destiny's blood revealed that she had methamphetamine and amphetamine in her system at the time of her death. Dr. Habbe reviewed the toxicology report and testified that the results did not alter his determination of cause of death.

was approximately 11 feet. Outside Rogers's home, Sergeant Kinney measured the distance between the back door and the location where the .45 was found, which he testified was between 39 and 40 feet.

[¶21.]        During the investigation, law enforcement gathered video surveillance from businesses located near Rogers's home including from Juneks car dealership, Common Cents, and Black Hills State University. Detective Fox testified that the Juneks video showed a section of St. Joseph Street in Spearfish, which was the most-direct path from Rogers's house to Derrek's house. Detective Fox reviewed the footage and testified that he did not see a vehicle matching the description of Derrek's Mazda 6 pass by in the time surrounding the 911 call. The State also called Carol Latusek, Lawrence County Clerk of Court, to lay the foundation necessary for admission of certified copies of documents establishing Rogers's prior felony drug conviction. Forensic Chemist Jeremy Kroon testified that he received blood and urine samples from Rogers and tested them for the presence of drugs. Kroon testified that both samples contained methamphetamine.

[¶22.]        Forensic Scientist Patrick Jones testified that he conducted forensic gunshot residue (GSR) tests on the samples obtained from Rogers's and Derrek's hands at the time they were first detained or arrested. Both Rogers's and Derrek's GSR kits included samples taken from the palm and backside of their left and right hands. Jones testified that both Rogers and Derrek had GSR particles on their samples.

[¶23.]        Jones explained that GSR can get on a sample in three ways: a person fires a gun, is near a gun when it is fired, or GSR is transferred from one surface to

another. GSR particles do not biodegrade but can be washed away or broken into smaller particles that can no longer be identified as GSR.

[¶24.] The State presented a theory at trial that the GSR on Derrek's hands was transferred from another source. The State called Detective Sayles, the officer that arrested Derrek and handcuffed him by securing his hands behind his back. Detective Sayles testified that his SRT uniform included a pair of gloves that he had owned for approximately nine months to a year prior to Derrek's arrest. During this time, Detective Sayles wore the gloves during SRT training, including firearms training, and anytime that SRT responded to a call. The gloves were admitted as evidence but were never tested to determine whether they contained GSR. The State argued to the jury that GSR particles transferred from Detective Sayles's gloves to Derrek's hands when Derrek was arrested.

[¶25.] Law enforcement executed a search warrant on Verizon to obtain the call detail records (CDR) from Rogers's and Derrek's cell phones. The data was then sent to Special Agent Sean Kennedy, an FBI analyst, for examination. He explained that CDR is maintained by cellular providers and shows the connections made between cell phones and cell towers. Special Agent Kennedy testified that due to the delay in issuing the search warrant to Verizon, the data he received was limited to "dropped calls," meaning that a phone call or text message originated from the cell phone, but failed and did not connect to another device on the other end.

[¶26.] For Derrek's phone, the CDR data showed that the phone connected to the cell tower nine times between 10:18 p.m. and 10:47 p.m. on January 21. For

each of these connections, Derrek's phone was between 2 and 2.1 miles from the cell tower. Between 1:45 a.m. and 1:52 a.m., Derrek's phone connected to the same cell tower five times and was again located between 2 and 2.1 miles from the tower. Special Agent Kennedy testified that although he could not pinpoint a specific location based on the CDR data alone, the data was consistent with Derrek being at his house during the identified periods. Special Agent Kennedy acknowledged that because there was no data between 10:47 p.m. on January 21 and 1:45 a.m. on January 22 he could not opine on the location of Derrek's cell phone during that time based on the CDR data alone. However, Special Agent Kennedy testified that he also reviewed the text messages between Reddy and Derrek which in combination with the CDR data led him to opine that Derrek's phone was likely at Reddy's house when Destiny was shot.

[¶27.] Law enforcement also sent Derrek's, Rogers's, and Reddy's cell phones, along with several other devices, to the Internet Crimes Against Children (ICAC) office in Rapid City for a physical extraction of the data stored on the devices. Detective Matthew Almeida testified about the process for extracting data from cell phones and explained that law enforcement relies on technology to bypass a device's security features, but that the technology is typically six months behind the development of new security features by cell phone manufacturers. Accordingly, Detective Almeida testified that the amount of data that can be extracted from a cell phone is largely dependent on the phone's make and model.

[¶28.] Detective Almeida explained that he extracted, or attempted to extract, the data from Rogers's, Derrek's, and Reddy's cell phones. From Rogers's

phone, Detective Almeida testified that he obtained a limited extraction that included only text messages, phone calls, images, and videos. Detective Almeida obtained a "really thorough" extraction from Reddy's phone, including the messages between Reddy and Derrek sent on the Grindr app. However, Detective Almeida testified that Grindr does not store historical location data. Detective Almeida attempted to do an extraction of Derrek's phone but was not given the password and the phone "wasn't supported on any tool [he] had access to."

[¶29.]     On cross-examination, Rogers inquired about the type of location data that can be stored on cell phones. Detective Almeida explained that cell phones may contain location data, but that extracting the data requires "a perfect storm" of favorable conditions. He explained that for a full extraction the user must have applications on the phone that utilize the user's location and the user must have authorized the application to track their location.

[¶30.]     After the unsuccessful attempt to extract the data from Derrek's phone, it was returned to the Spearfish Police Department along with several other devices on February 1, 2022, with an extraction report. Detective Hofman released Derrek's phone to him on February 16. In June 2022, Detective Hofman reviewed the extraction report and learned that Detective Almeida was unable to extract the data from Derrek's phone. Detective Hofman then applied for and received a second search warrant for the phone. However, shortly after Derrek got his phone back in February, he disposed of it at a Walmart kiosk for $2.00. Regardless, the phone Derrek owned in June 2022 was seized and extracted pursuant to the second search warrant, but the extracted data was not relevant to the investigation of the crime.

[¶31.]    On cross-examination, Detective Hofman acknowledged that his decision to return Derrek's phone without first notifying Rogers violated SDCL 23A-37-15.  He agreed with Rogers that he was responsible for reviewing the extraction report and failed to do so until after he had returned the phone to Derrek.  Detective Hofman explained that when he returned the phone, he no longer believed that Derrek was involved in Destiny's murder and did not want to keep his property longer than necessary.

[¶32.]    The State also called three witnesses who conducted forensic testing on the .45, magazine, holster, spent cartridge casing, and the bullet recovered from Destiny's body.  First, Forensic Scientist Ashley Bullock testified that she analyzed the evidence for DNA.  Bullock received known DNA samples from Rogers, Derrek, and Destiny.  She testified that Rogers's DNA was identified on the textured grip of the .45, the edges of the holster, the seven cartridges inside the magazine of the .45, and on the edges of the magazine itself.  Neither Rogers's nor Derrek's DNA was found on the spent .45 cartridge casing.  Derrek's DNA was not positively identified on the grip of the .45, holster, magazine, or cartridges inside the magazine.  However, Bullock testified that there was a minor DNA contributor on the holster, cartridges inside the magazine, and the magazine itself but the DNA profile was too complex to compare, so she could not scientifically exclude Derrek's DNA as a contributor on these items.  Bullock collected a swab from the tip of the barrel of the .45 and testified that Destiny's DNA was present.

[¶33.]    Additionally, the State called Forensic Scientist Adam Dolezal who conducted a forensic examination of the .45 and .22 caliber weapons.  Dolezal first

testified about the ammunition found in the bag in Rogers's kitchen. He explained that all of the bullets were for a .45 automatic caliber gun. There were three different types of bullets in the bag: Federal Hydra-Shock bullets which have a hollow point and a post inside the point, round-nose bullets with a full metal jacket, and flat-nose bullets with a total metal jacket. Dolezal then compared the bullets in the bag to the unspent bullets in the magazine of the .45. Dolezal testified that there were Federal Hydra-Shock bullets in both the bag and the magazine. He also testified that the flat-nose bullets in both the bag and the magazine appeared to have been remanufactured.[7]

[¶34.]	Dolezal testified that the bullet recovered from Destiny's body was a .45 caliber flat-nose bullet with a total metal jacket. He testified that the bullet was "similar in design and material and composition" to the bullets he examined from the bag and those in the magazine. When he compared the bullet to the .45 found under the wooden landing, he testified that the "class characteristics" matched. Specifically, he identified the "number of grooves and the rifling of the barrel and the width of the land and grooves is the same." However, because there was damage to the surface of the bullet extracted from Destiny's body, he could not identify sufficient "individual characteristics" to either identify the .45 as the firearm that fired the fatal bullet or eliminate it.

[¶35.]	Similarly, Dolezal examined the spent shell casing found near Destiny's body which he testified was a .45 caliber fired cartridge case head

---

7.	Dolezal explained that it is common for companies to take discharged cartridge cases and reload the case with their own bullets. When that occurs, there will be various headstamps on the cases.

stamped "Federal .45 auto." He testified that there were similarities in the class characteristics between the casing and the .45[8] but not enough to make a conclusive identification from the ballistic evidence alone that the .45 was the murder weapon.

[¶36.] Dolezal testified that when he examined the .45, he saw that the serial number was obliterated. He explained that he was able to chemically etch the metal plate where the serial number was originally stamped, which ultimately allowed him to determine the firearm's serial number.[9]

[¶37.] Additionally, the State called Forensic Scientist Kristin Walti who analyzed the evidence for fingerprints. Walti testified that she found a fingerprint on the spent shell casing found near Destiny's body, which was identified as Rogers's left pinky finger. Walti also analyzed the .45, magazine, and seven unspent cartridges from the magazine, but was unable to find any prints suitable for comparison.

[¶38.] The State also called former Spearfish Police Officer Andrew Pearson who introduced text messages sent by Rogers to Sterling Copas on June 27, 2021, in

---

8. Dolezal testified that the .45 had a hemispherical firing pin and the imprint on the shell casing was also hemispherical. Within the firing pin, there are concentric rings, which also appeared on the casing.

9. Dolezal explained that when a serial number is stamped, "the crystalline structure of the metal changes" underneath the stamped area and the area that has been stamped is harder than the area that has not been stamped. The chemical etching affects the area that was not stamped, allowing the stamped area to be seen.

which Rogers inquired about where to purchase a gun.[10]  Rogers stated, "If u hear of a gun let me know I don't have money but my soul would probably be set free lol jk."  Copas responded, "Not sure ……I can ask around."  Rogers replied, "I mean I'm pretty sure I'd use it weather [sic] on myself or someone but na I better not once I get some cash lined up I probably will tho."

[¶39.]     The State also presented testimony regarding a history of domestic conflict between Rogers and Destiny offering, through the testimony of Officer Bradley, the text messages sent by Rogers to Destiny on October 8, 2020.  The following messages sent by Rogers to Destiny were read to the jury:

- "Im gonna fucking kill u"
- "I hate u and i wanna make u feel the same as i do you little bitch"
- "I wanna punch u in the fucking face intel [sic] all ur teeth are in ur stomach"
- "U better watch ur fucking self cause i sware im gonna get u bitch"
- "I hope u know u hurt me and im tierd of hurting i think beating ur fucking face is the onky [sic] thing thats gonna make u stop hurting everyone around u"
- "I wanna put u in the ground where u belong"
- "Is that crazy enough for u yet"
- "Do u need me to actually do that shit to get my point across"
- "I can be that guy if u need"
- "Id reallt [sic] like to get on one are u gonne help me or do i need to prove that I am crazy and come to ur house"

---

10.   Outside the presence of the jury, Rogers stipulated to the foundation for this exhibit.  It appears that Rogers's cell phone was previously seized incident to an unrelated arrest and was extracted, revealing the text messages.

[¶40.]    The State's final two witnesses were Derrek and Reddy.[11]  Derrek testified that he met up with Reddy three times on January 21—first, around 5:30 a.m. where they had a sexual encounter, again around 2:30 p.m. to borrow twenty dollars, and finally around 11:30 p.m.  Consistent with his prior interviews, Derrek testified that during the 11:30 p.m. meet-up, they engaged in oral sex and Derrek left Reddy's house between 1:20 a.m. and 1:30 a.m. on January 22.  When asked about the bruises and marks on his body on January 22, Derrek explained, "[t]hey were from trying to shoot dope.  And the best way to do it, if you can't find a vein, is to use a flashlight and try to find a vein somewhere.  You end up missing and that blood goes and causes a bruise."

[¶41.]    Derrek also testified about his contacts with Rogers on January 21.  He stated that he went to Rogers's house around 11:00 a.m. but did not see or talk to Rogers.  Later that night, Derrek called Rogers and testified that Rogers said he was busy and would call back later.  After the call, Derrek texted Rogers and said, "We need to meet face to face…ASAP."  But Derrek testified that he did not actually see Rogers that day.

[¶42.]    Contrary to Derrek's testimony, Reddy testified that Derrek did not come to his house in the early morning on January 21.  During his testimony, Reddy read the text messages between himself and Derrek.  He testified that he texted Derrek "I'm home" at 11:27 p.m. on January 21.  Derrek responded, "Okay. About 15 minutes. Almost got it," referencing Derrek's attempt to inject

---

11.    Derrek acknowledged that he had an immunity agreement from the State regarding this testimony at trial.

methamphetamine into a vein. At 11:53 p.m., Derrek told Reddy that he was walking out his door and Reddy testified that Derrek arrived at his house "[v]ery shortly after that." Reddy testified that he took a photo of Derrek's penis at 1:23 a.m. and believed Derrek left 10-15 minutes later. At 1:42 a.m., Derrek texted Reddy, "Goodnight…thanx and i apologize for not cumming, you were terrific so dont for one second think it was your fault, u went above and beyond…" Reddy testified that Derrek remained at Reddy's house from the time he got there to the time he left.

[¶43.] Reddy recalled the conversation he had with Derrek on January 26. Reddy stated that Derrek apologized for getting him involved in the case and said that he and Rogers had been in an argument. Reddy assumed that the argument occurred on January 21 before Derrek went to Reddy's house but agreed that it was an assumption and Derrek did not state when the argument occurred. Reddy also testified that "[t]here was no mention of any kind of physical altercation," contrary to what Reddy reported to law enforcement in his second interview.

[¶44.] Reddy was cross-examined about the inconsistencies in his statements regarding whether Derrek stated a physical altercation with Rogers had occurred. Rogers also impeached Reddy by highlighting that Reddy told law enforcement that he suspected Derrek was using drugs, when the text messages reveal that Derrek told Reddy he was using drugs. Reddy acknowledged that the Grindr messages indicated that he and Derrek engaged in sexual relations early in the morning on January 21, but said he did not remember meeting and "there were times that we just talked about meeting, but we never did. Many, many times."

[¶45.] The State rested, and Rogers made a motion for judgment of acquittal on Counts 1, 1A, 2, 4, and 5. Rogers argued that the evidence was insufficient to overcome Rogers's defense that Derrek was the shooter. The circuit court denied Rogers's motion. Rogers rested without calling any witnesses. During the settlement of the instructions, Rogers requested a spoliation instruction which the circuit court denied.

[¶46.] The jury found Rogers not guilty of first-degree murder and guilty of second-degree murder, two counts of possession of a firearm by a person with a prior felony drug conviction, possession of a firearm with an altered serial number, commission of a felony while armed with a firearm, and unauthorized ingestion of a controlled substance. The circuit court sentenced Rogers to life in prison without the possibility of parole for second-degree murder, two years in prison for each gun-related conviction, and five years in prison for the unauthorized ingestion conviction. Each sentence was ordered to run consecutively.

[¶47.] Rogers appeals, raising three issues, which we restate as follows:

1. Whether the circuit court erred by denying Rogers's motion for judgment of acquittal.

2. Whether the State violated Rogers's due process rights by returning Derrek's phone before it had been properly extracted.

3. Whether the circuit court abused its discretion by denying Rogers's request for a spoliation jury instruction.

## Analysis and Decision

### 1.  Whether the circuit court erred by denying Rogers's motion for judgment of acquittal.

[¶48.]     "The denial of a motion for judgment of acquittal is a question of law we review de novo." *State v. Harruff*, 2020 S.D. 4, ¶ 15, 939 N.W.2d 20, 25 (citation omitted).  "The standard is 'whether the evidence was sufficient to sustain a conviction.'" *Id.* (quoting *State v. Klaudt*, 2009 S.D. 71, ¶ 14, 772 N.W.2d 117, 122). "When measuring the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (cleaned up).  "We accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." *Id.* (quoting *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83).  "This Court will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence." *Id.*

[¶49.]     Rogers moved for a judgment of acquittal on five counts—1: first-degree murder, 1A: second-degree murder, 2: possession of a firearm (.45 caliber pistol) by a person with a prior drug felony, 4: possession of a firearm (.45 caliber pistol) with altered serial number, and 5: commission of a felony while armed with a firearm.  Rogers did not include the ingestion of a controlled substance or the counts relating to his possession of the .22 in his motion.  Rogers was acquitted of Count 1, first-degree murder, and thus only challenges the circuit court's denial of the motion with respect to the remaining counts.

[¶50.] Rogers argues, as he did to the jury, that the proof of "five facts" revealed the State's inability to prove its case beyond a reasonable doubt: (1) the police broke the law during the investigation; (2) the police gave material evidence away; (3) the police contaminated important forensic evidence; (4) Derrek's alibi is "unquestionably weak"; and (5) "the material omissions of evidence." Relying on these alleged facts, Rogers challenges the sufficiency of the evidence to support to verdict.

[¶51.] "A defendant is guilty of second-degree murder if he 'perpetrate[s] . . . any act imminently dangerous to others and evincing a depraved mind, without regard for human life, although without any premeditated design to effect the death of any particular person, including an unborn child.'" *State v. Little Long*, 2021 S.D. 38, ¶ 69, 962 N.W.2d 237, 259 (alteration in original) (quoting SDCL 22-16-7). "'Depraved mind' is a 'mens rea requirement involv[ing] less culpability than the element of premeditation required for first-degree murder.'" *State v. Larson*, 2022 S.D. 58, ¶ 42, 980 N.W.2d 922, 933 (alteration in original) (citation omitted).

[¶52.] Although Rogers called no witnesses, he effectively cross-examined the State's witnesses to present evidence on each of his "five facts." During cross-examination, Rogers challenged the quality of Detective Hofman's investigation. Detective Hofman admitted when questioned that it was his responsibility to comply with SDCL 23A-37-15 before returning Derrek's cell phone and that he failed to do so.[12] Detective Hofman also admitted that he did not make a report to

---

12. SDCL 23A-37-15 requires that law enforcement notify a defendant prior to returning seized property to the owner.

Child Protection Services despite having knowledge that Derrek was using methamphetamine and had two minor children in his home. Rogers also questioned many of the State's witnesses about the proper procedure for collecting and storing evidence and admitted photographs showing evidence being handled with dirty gloves and evidence placed on surfaces without clean paper underneath to avoid cross-contamination. Rogers impeached Derrek with prior inconsistent statements, his criminal history, and his drug use. He highlighted to the jury the fact that Derrek had gunshot residue on his hands. And he attacked Derrek's alibi by impeaching Reddy in several respects. Specifically, Rogers attacked Reddy's inconsistent statements regarding meetups with Derrek earlier in the day on January 21 and Reddy's recollection of Derrek's statements on January 26 indicating that Derrek had an altercation with Rogers.

[¶53.] It was the jury's responsibility, however, to examine the testimony and evidence and accord to it the value it deserves. "[T]he jury is . . . the exclusive judge of the credibility of the witnesses and the weight of the evidence." *State v. Manning*, 2023 S.D. 7, ¶ 27, 985 N.W.2d 743, 753 (citation omitted). The weaknesses in the State's case asserted in Rogers's "five facts" are issues for the jury to consider when judging the strength of the State's case, the credibility of the key witnesses, and the weight to be given to the evidence admitted. Contrary to Rogers's assertion, the proof of the "five facts" does not bear definitively on the elements of the crimes for which he was convicted.

[¶54.] When considering the evidence in a light most favorable to the verdict, it was reasonable for the jury to accept Derrek's alibi and find Rogers guilty of

Destiny's murder. Rogers inconsistently recalled the details of the event and ultimately, Rogers's version of events was refuted by the forensic evidence presented by the State's witnesses. Most critically, Rogers placed Derrek no less than 11 feet away from Destiny when he allegedly fired the shot. However, Dr. Habbe's opinion testimony established that the gun barrel was touching Destiny's arm when it was fired, and this was corroborated by the presence of Destiny's DNA on the tip of the barrel of the .45. Further, Rogers's DNA was found in multiple places on the firearm, holster, and ammunition, where Derrek's DNA was not found.

[¶55.] The October 2020 text messages show that Rogers previously threatened to kill Destiny and six months prior to her murder, Rogers texted Copas asking where to buy a gun. On the morning of January 21, Niemi testified that Destiny and Rogers argued on the phone and Destiny "was very adamant" that she would not get in the car with Rogers to travel to Rapid City.

[¶56.] Derrek's alibi was supported by his text messages with Reddy planning their sexual rendezvous, which established a timeline for the night. Derrek texted Reddy that he was leaving his house at 11:53 p.m. on January 21 and both Derrek and Reddy testified that he arrived at Reddy's house shortly thereafter. Reddy took a photo of Derrek's penis at 1:23 a.m. on January 22 and testified that Derrek had not left Reddy's house before that time. They both agreed that Derrek left shortly after the photo was taken and Derrek sent Reddy a text thanking him for the evening at 1:42 a.m. While Rogers highlighted inconsistencies between Derrek's and Reddy's testimonies regarding the existence of prior encounters on January 21,

the evidence established that the two men were together from approximately 11:50 p.m. on January 21 until approximately 1:30 a.m. on January 22.

[¶57.]    After viewing the evidence in a light most favorable to the verdict, a rational trier of fact could have found that Rogers, and not Derrek, shot and killed Destiny. *See Harruff*, 2020 S.D. 4, ¶ 49, 939 N.W.2d at 32. Based on our review of the record, we conclude that the evidence was sufficient to support the conviction of second-degree murder and the related convictions for possession of a firearm (.45 caliber pistol) by a person with a prior drug felony, possession of a firearm (.45 caliber pistol) with an altered serial number, and commission of a felony while armed with a firearm. Accordingly, the circuit court did not err by denying Rogers's motion for judgment of acquittal.

### 2. *Whether the State violated Rogers's due process rights by returning Derrek's phone before it had been properly extracted.*

[¶58.]    "The Due Process Clause of the Fourteenth Amendment imposes upon states the requirement to ensure that 'criminal prosecutions . . . comport with prevailing notions of fundamental fairness.'" *State v. Zephier*, 2020 S.D. 54, ¶ 20, 949 N.W.2d 560, 565 (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413 (1984)). "Implicit in this standard is the necessity that 'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Id.* (quoting *Trombetta*, 467 U.S. at 485, 104 S. Ct. at 2532). "To safeguard that right, the Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" *Trombetta*, 467 U.S. at 485, 104

S. Ct. at 2532 (quoting *U.S. v. Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S. Ct. 3440, 3446, 73 L. Ed. 2d 1193 (1982)).

[¶59.]     Within this body of law "two distinct lines of cases have developed—cases in which the exculpatory value of the undisclosed evidence is known and cases where it is not." *Zephier*, 2020 S.D. 54, ¶ 21, 949 N.W.2d at 565.  The first category is "the prototypical violation of the rule set out in *Brady v. Maryland* where a prosecutor does not share information or evidence that is, nevertheless, identifiable and intact and is 'either material to the guilt of the defendant or relevant to the punishment to be imposed.'" *Id.* (quoting *Trombetta*, 467 U.S. at 485, 104 S. Ct. at 2532).  "Whether the prosecution's suppression of this type of evidence will lead to a due process violation that results in a new trial turns on the materiality of the suppressed evidence—not the good faith or bad faith of the prosecutor." *Id.* (citing *State v. Birdshead*, 2016 S.D. 87, ¶ 18, 888 N.W.2d 209, 215).  The second category includes "cases where the exculpatory value of the undisclosed evidence is unknown because it has been destroyed, or lost, or compromised in some way." *Id.* ¶ 22, 949 N.W.2d at 566.

[¶60.]     Here, Derrek's cell phone—more specifically the location data that may have been stored on Derrek's cell phone—falls under the second category because Derrek's phone was returned to him before any potential location data was extracted from the device.  Therefore, we look to the rule established in *Trombetta* to determine its materiality:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.  To meet this standard of constitutional materiality,

> evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

467 U.S. at 488–89, 104 S. Ct. at 2534 (internal citation omitted). "Once this standard of constitutional materiality has been shown, a failure to preserve such evidence for use by a defendant is a due process violation." *State v. Jackson*, 2020 S.D. 53, ¶ 28, 949 N.W.2d 395, 404.

[¶61.] "However, *Trombetta's* materiality test will not resolve all due process challenges in cases of lost or destroyed evidence." *Zephier*, 2020 S.D. 54, ¶ 24, 949 N.W.2d at 566 (citation omitted). "In some instances, this evidence cannot satisfy the materiality test, and the most that could be said is that it 'could have been subjected to tests, the results of which might have exonerated the defendant.'" *Id.* (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281 (1988)). "For these cases involving only 'potentially useful' lost or destroyed evidence, the Supreme Court contrasted the rule of *Brady* that 'makes the good or bad faith of the State irrelevant' and held that a defendant must show that law enforcement officers acted in bad faith to establish a due process violation[.]" *Id.* (quoting *Youngblood*, 488 U.S. at 57, 109 S. Ct. at 337).

[¶62.] Rogers first argues that Derrek's cell phone was constitutionally material under *Trombetta*, making bad faith irrelevant. He asserts that the phone's exculpatory value was apparent before the phone was released because Derrek told law enforcement during his interviews that his phone would show where he was. However, these statements, at most, put law enforcement on notice that Derrek's phone contained evidence that was exculpatory to Derrek. Stated another way,

Derrek's statements to law enforcement supported the assumption that his phone would exonerate him, not that it would have exculpatory value to Rogers. Further, Derrek's statements regarding his phone, when taken in context, suggest that Derrek was referring to the text messages between himself and Reddy. When Derrek's phone was released, law enforcement already had those messages and believed that they corroborated Derrek's alibi.

[¶63.] It is worth noting that Rogers did not want the phone itself. Rather, he asserts that he was constitutionally entitled to the location data stored on Derrek's phone. However, the testimony at trial established that the likelihood of extracting precise location data from Derrek's phone was, at best, uncertain. Detective Almeida testified that extracting location data required a "perfect storm" of favorable conditions to obtain all available data and Special Agent Kennedy testified that even if the data could be extracted, "[t]he accuracy can be debated."[13] Notably, law enforcement was unable to obtain location data from Rogers's phone even though it was extracted.

[¶64.] On this record, establishing the apparent exculpatory value of the unavailable data requires a complex chain of assumptions. We must assume that Derrek's phone would have been the correct make and model for a more thorough extraction, that Derrek had apps that stored his location data and that he had permitted them to use his location, that the data could show his location accurately,

---

13. Detective Almeida's testimony established that the amount of information that can be extracted from a cell phone is highly dependent on the make and model of the phone. The ability to extract location data, specifically, is also dependent on whether the user enabled applications to access the user's location.

and that the data would have contradicted the text messages and testimony establishing that Derrek was at Reddy's house. This chain of assumptions is insufficient to establish the constitutional materiality required by *Trombetta*.

[¶65.] In the absence of a showing of materiality, "a defendant must show that law enforcement officers acted in bad faith to establish a due process violation." *Zephier*, 2020 S.D. 54, ¶ 24, 949 N.W.2d at 566. We have "recognized that mere negligence in the loss or destruction of evidence does not result in a constitutional violation." *State v. Bousum*, 2003 S.D. 58, ¶ 16, 663 N.W.2d 257, 263 (citation omitted). Rather, we have previously taken guidance from the North Dakota Supreme Court's definition of bad faith in this context which states:

> Bad faith, as used in cases involving destroyed evidence or statements, means that the state deliberately destroyed the evidence with the intent to deprive the defense of information; that is, that the evidence was destroyed by, or at the direction of, a state agent who intended to thwart the defense.

*Id.* (quoting *State v. Steffes*, 500 N.W.2d 608, 613 (N.D. 1993)).

[¶66.] Regarding bad faith, the circuit court found that "the defense cannot show that the Spearfish Police Department, the State's Attorney's Office, or the Rapid City Police Department engaged in any bad faith." Rogers claims that this finding is erroneous in light of the circuit court's ruling on a pretrial motion to suppress where it found that law enforcement intentionally and knowingly violated Rogers's Sixth Amendment right to counsel by arranging for a jail visit between Derrek and Rogers, who was represented by counsel, in order to record their

conversation.[14] Specifically, Rogers highlights that the Sixth Amendment violation and the return of Derrek's phone happened within the same two-week period. The phone was returned from ICAC on February 1, 2022, and was released to Derrek on February 16. The recorded visit between Derrek and Rogers leading to the suppression motion occurred on February 4. However, aside from the timeframe, Rogers presented no other evidence suggesting that the actions were in any way related.

[¶67.]        Detective Hofman testified that despite receiving the report indicating that Derrek's phone had not been extracted on February 1, 2022, he did not read the report until June, and did not know that the extraction had not been done. Detective Hofman also testified that at the time he returned the phone, he "didn't feel that [Derrek] was involved, you know, with the actual homicide itself." Further, because the extraction was not done, Detective Hofman did not know what the phone contained when he released it to Derrek. The circuit court found that law enforcement was negligent when it released the phone but did not find that the actions were taken in bad faith.

---

14.    The circuit court held an evidentiary hearing on Rogers's motion to suppress. After the hearing, the circuit court issued findings of fact and conclusions of law, in which it found that on January 26, 2022, Lawrence County Jail staff were informed that Derrek was not authorized to visit Rogers because Derrek was a "material witness." During Derrek's interviews with law enforcement, he indicated that he wished to speak with Rogers about Destiny's murder. On January 28, Captain Little with the Lawrence County Jail received a phone call from the Spearfish Police Department requesting that Derrek be permitted to visit Rogers. The following day, Lawrence County Jail staff were informed that Derrek was now allowed to visit Rogers but only using a device that was "recordable." Derrek visited Rogers at the jail via a recorded video teleconference on February 4, 2022. The circuit court suppressed the recording.

[¶68.]     Based on a careful review of the record we conclude that Rogers did not make a sufficient showing of bad faith. The record does not indicate that law enforcement released Derrek's cell phone "in a calculated effort to gain a tactical advantage or to suppress exculpatory evidence." *Jackson*, 2020 S.D. 53, ¶ 33, 949 N.W.2d at 405. Rather, the testimony establishes that law enforcement seized Derrek's cell phone and sent it to be extracted with the intention to discover the information contained within it. When law enforcement released Derrek's cell phone, they did not know that the data was not extracted and they no longer believed that Derrek was involved in Destiny's murder.

[¶69.]     We note that SDCL 23A-37-14 requires that law enforcement preserve seized property for use in criminal prosecutions and SDCL 23A-37-15 requires notice to criminal defendants before property is returned to its owner. Detective Hofman acknowledged at trial that he did not comply with these provisions when he released Derrek's cell phone. "However, we have never held that a violation of SDCL 23A-37-15 leads reflexively to a due process violation and the sanction of exclusion or a new trial." *Zephier*, 2020 S.D. 54, ¶ 29, 949 N.W.2d at 568.

[¶70.]     On this record, Rogers has not established that Derrek's cell phone possessed evidence of apparent exculpatory value before it was released nor has he shown that law enforcement acted in bad faith when they released it to Derrek. Therefore, we conclude that no due process violation occurred.

### 3. Whether the circuit court abused its discretion by denying Rogers's request for a spoliation jury instruction.

[¶71.] "A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard." *State v. Black Cloud*, 2023 S.D. 53, ¶ 50, 996 N.W.2d 670, 683 (quoting *State v. Schumacher*, 2021 S.D. 16, ¶ 25, 956 N.W.2d 427, 433). "To establish reversible error from a trial court's refusal to give a requested instruction, the party asserting error must show that (1) the tendered instruction was a correct statement of the law, (2) the instruction was warranted by the evidence, and (3) the error in not giving the instruction was prejudicial." *State v. Engesser*, 2003 S.D. 47, ¶ 43, 661 N.W.2d 739, 753 (citation omitted). "An instruction on the inference that may be drawn from the spoliation of evidence is proper only when substantial evidence exists to support a conclusion that the evidence was in existence, that it was in the possession or under the control of the party against whom the inference may be drawn, that the evidence would have been admissible at trial, and that the party responsible for destroying the evidence did so intentionally and in bad faith." *Id.* ¶ 46, 661 N.W.2d at 755 (citation omitted).

[¶72.] The circuit court declined to give Rogers's requested spoliation jury

instruction,[15] instead giving Instruction 48, taken from *State v. Zephier*, which

stated:

> It is the law of this state that when property is seized by law enforcement which constitutes evidence of a crime, law enforcement must safely keep such property as evidence as long as it is required for trial and must not dispose of the same without an order of the court. It is for your sole and exclusive determination whether returning the property to Donovan Derrek without a court order, and the weight to be given such fact, bears upon the innocence or guilt of the defendant.

---

15. Rogers's proposed spoliation instruction provided:

> The [c]ourt has determined that material evidence, i.e., Donovan Derrek's cell phone, was destroyed while in the care of and dominion of law enforcement. You are hereby instructed to presume that said evidence was destroyed by law enforcement in bad faith and you may infer that the Donovan Derreck [sic] cell phone evidence was unfavorable to the State.

Alternatively, Rogers proposed the following instruction patterned after the instruction given in *State v. Zephier*:

> It is the law of this state that when property is seized by law enforcement which constitutes evidence of a crime, law enforcement must safely keep such property as long as it is required for trial and must not dispose of the same without an order of the court. It is an express finding of the [c]ourt that law enforcement violated statutory law requiring law enforcement personnel in possession of Donovan Derrek's cell phone to notify the Defendant before returning it to the owner. Had the Defendant been provided with statutorily required notice to return the seized property he would have objected and the [c]ourt would have required law enforcement to retain the cell phone.
>
> It is for your sole and exclusive determination whether returning the cell phone to Donovan Derek [sic] without a court order in violation of law bears upon the verdict, guilty or not guilty, and the weight to be given to such fact.

[¶73.] We have previously noted that "the spoliation rule should be 'applied with caution[.]'" *Engesser*, 2003 S.D. 47, ¶ 48, 661 N.W.2d at 755 (citation omitted) (alteration in original). "Only intentional destruction will sustain the rule's rationale that the destruction amounts to an admission by conduct of the weakness of one's case." *Id.* ¶ 44, 661 N.W.2d at 754 (citation omitted). Here, a spoliation instruction was unwarranted by the facts because the record does not contain a sufficient showing of bad faith by law enforcement. Further, the circuit court took remedial measures to address the State's noncompliance with SDCL 23A-37-15 by allowing Rogers broad leeway to cross-examine Detective Hofman about the decision to return Derrek's cell phone and by giving Instruction 48, allowing the jury to "exercise their judgment to determine the significance of the State's statutory noncompliance[.]" *Zephier*, 2020 S.D. 54, ¶ 33, 949 N.W.2d at 569. We, therefore, conclude that the circuit court did not abuse its discretion by denying Rogers's requested spoliation instruction.

## Conclusion

[¶74.] After a thorough review of the record, we affirm the circuit court's denial of Rogers's motion for judgment of acquittal. We also determine that the State did not violate Rogers's right to due process by returning Derrek's cell phone. Additionally, we conclude that the circuit court did not abuse its discretion by denying Rogers's request for a spoliation jury instruction.

[¶75.] JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.